[No. A049442. First Dist., Div. Four. Oct. 28, 1992.]

LEONARD HELFAND et al., Plaintiffs and Respondents, v.
NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,
PA., Defendant and Appellant.

870

**Counsel**

Pettit & Martin, D. Wayne Jeffries, Saul D. Bercovitch, Robinson & Wood, Archie S. Robinson, Thomas R. Fellows, Stroock, Stroock & Lavan, Michael F. Perlis, Horvitz & Levy, Ellis J. Horvitz and Peter Abrahams for Defendant and Appellant.

Ross, Dixon & Masback, Barbara E. Etkind and F. Clinton Broden as Amici Curiae on behalf of Defendant and Appellant.

Cotchett, Illston & Pitre, Joseph W. Cotchett, Susan Illston, Marie Seth Weiner, Morgan, Ruby, Schofield, Franich & Fredkin, Allen J. Ruby, Lexie D. Schroeder, Remcho, Johansen & Purcell, Joseph Remcho, Robin B. Johansen, Karen Getman, Wendy S. Stimling, Thomas T. Anderson, Samuel Trussell, Crosby, Heafey, Roach & May, Ronald L. Murov, Howard A. Janssen, Severson & Werson, Gerald J. Buchwald, Michael B. Murphy and Elizabeth A. Syufy for Plaintiffs and Respondents.

**Opinion**

**ANDERSON, P. J.—**

## I. Introduction and Background

This appeal is but one round in the complex, bitter legal battle between the defrauded investors of Technical Equities Corporation (Technical Equities) and its insurer—appellant National Union Fire Insurance Company of Pittsburgh, Pa. (National Union). At stake are millions of dollars in insurance proceeds to pay for claims which the investors pursued against the officers and directors of Technical Equities and over $140 million in damages later assessed against National Union.

National Union is the liability insurer of the directors and officers[1] of Technical Equities. Respondents Leonard and Eileen Helfand (plaintiffs) invested in securities offered by Technical Equities, only to find their investment substantially worthless after the company's financial collapse and bankruptcy. Hundreds of investors like plaintiffs have sued the company's directors and officers; multiple judgments have been entered in these suits against them for economic losses, emotional distress and prejudgment interest.

Plaintiffs' action[2] is for declaratory relief to determine the scope of coverage under the "Directors and Officers Liability and Corporation Reimbursement" policy of insurance which Technical Equities took out with National Union for the three-year period from August 1, 1984, to August 1, 1987. Technical Equities prepaid its $30,290 premium in return for $10 million in coverage for each policy year.

National Union concedes there is $10 million in coverage for the second policy year. At issue is whether there is coverage under the first and third policy years, and whether the policy itself is a wasting asset, so that defense costs are included within the policy limits of $10 million per year.

The trial court ruled against National Union on all three issues. The judgment in this case and in the companion case of Chatton v. National Union (Super. Ct. Santa Clara County, 1991, No. 600306*) (involving coverage under a comprehensive general liability (CGL) policy) set the stage for two insurance bad faith suits against National Union brought on a coordinated basis by over 500 investors. McLaughlin et al. v. National Union (Super. Ct. Santa Clara County, 1991, No. 666839), combining seven plaintiff groups on a test case basis, resulted in judgment against National Union for $48,943,165.45, including $43 million in punitive damages for all plaintiffs. Abelson v. National Union (Super. Ct. Santa Clara County, 1991, No. 666840), in which National Union was found liable to all remaining plaintiffs, resulted in judgment of $120,500,181. (Both McLaughlin and Abelson are also on appeal, albeit not yet fully briefed.)

We conclude that (1) defense costs reduce the policy's liability limits and (2) there is $20 million available under the policy to pay for second and third year claims. Accordingly, we reverse in part and affirm in part.

---

[1] We sometimes abbreviate "directors and officers" as D&O.

[2] In addition to National Union, plaintiffs also named as defendants those individuals who were directors and officers of Technical Equities at the relevant times. All of the named former directors of Technical Equities and all but two of the named officers cross-complained against National Union for declaratory relief on the issues of defense costs and the policy's liability limits.

*Reporter's Note: See Chatton v. National Union Fire Ins. Co., ante, page 846 for opinion on appeal.

## II. DEFENSE COSTS ARE INCLUDED WITHIN THE LIABILITY LIMITS

### A. *Introduction*

██ National Union's first challenge is to the trial court's ruling that defense costs do not deplete the limits of liability available under the policy to pay for claims. Upon reconsideration of its summary adjudication ruling, the court concluded: "The National Union 1984-1987 D&O policy is not 'wasting' or 'self-consuming,' and National Union is obligated to pay the reasonable costs, charges and expenses of defense, including attorneys' fees of any insured under the policy, in addition to the limit of liability." The court reasoned that any "self-consuming" provisions were contrary to the reasonable expectations of the insureds, as a matter of law. Moreover, it concluded the policy was ambiguous, "such that a normal insured would not be aware of its 'self-consuming' nature."

The defense obligations of D&O carriers typically differ in nature and scope from the defense obligations of general liability carriers. For example, D&O policies generally do not obligate the carrier to provide the insured with a defense. More likely, they require the carrier to reimburse the insured for defense costs as an ingredient of "loss," a defined term under the policy. (See 1 Hutcheon & Thompson, Business Insurance Law and Practice Guide (Matthew Bender ed. 1992) Directors' & Officers' Liability Insurance, § 3.06[1]; Knepper & Bailey, Liability of Corporate Officers and Directors (4th ed. 1988) Liability Insurance § 21.09, pp. 705-709; Harley, Directors' and Officers' Liability Insurance (PLI ed. 1990) pp. 326-329.) This being the case, it is the insured, or the insured with the mutual agreement of the insurer, who selects defense counsel and controls the defense of the underlying case.

How the carrier's reimbursement obligation specifically interfaces with the limits of liability in a given D&O policy can only be determined by examining the language of that policy. This we do hand in hand with the familiar tools of contract interpretation.

██ The overriding goal of contract interpretation is to give effect to the parties' mutual intentions as of the time of contracting. (Civ. Code, § 1636.) Where contract language is clear and explicit and does not lead to an absurd result, we ascertain this intent from the written provisions and go no further. (Civ. Code, §§ 1638, 1639; *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253].) The words of a contract generally are to be understood in their ordinary and popular sense unless the parties use them in a technical sense or "a special meaning is given to them by usage . . . ." (Civ. Code, § 1644.)

However, if the terms of a contractual promise are ambiguous or uncertain, we must interpret the promise "in the sense in which the promisor believed, at the time of making it, that the promisee understood it." (Civ. Code, § 1649.) "This rule, as applied to a promise of coverage in an insurance policy, protects . . . 'the objectively reasonable expectations of the insured.'" (*Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1265 [10 Cal.Rptr.2d 538, 833 P.2d 545].) If use of this rule does not eliminate the uncertainty, then we construe the applicable language against the insurer, the drafter who created the uncertain language in the first place. (*Ibid.*; Civ. Code, § 1654.)

■ A policy provision is ambiguous if it is capable of more than one reasonable construction. (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co.* (1986) 41 Cal.3d 903, 912 [226 Cal.Rptr. 558, 718 P.2d 920].) However, we will not strain the policy language to create an ambiguity. (*Ibid.*) Moreover, we will not label a provision ambiguous simply upon isolating phrases and considering them in the abstract. Rather, we must construe the provision in relation to the whole of the instrument, with each clause giving meaning to the other. (*Id.*, at pp. 916-917 & fn. 7; Civ. Code, § 1641.)

## B. *Discussion*

■ Our analysis of this D&O policy uncovers no ambiguity concerning its "self-consuming" nature. The plain terms of the policy make it clear that defense costs are payable against the limits of liability just like any other element of "loss"[3] as defined in the policy. We arrive at this conclusion by examining the policy as a whole and the interplay between the defined concept of "loss" and various related provisions.

First, in the insuring clause National Union promises to pay on behalf of the insured officers and directors "*against loss* . . . arising from any claim or claims which are first made against the Insureds . . . during the policy period by reason of any Wrongful Act . . . in their respective capacities as Directors or Officers." (Italics added.) Next, clause 5 (titled "LIMIT AND RETENTION"), paragraph (b) as amended states: "[T]he Insurer's liability for any claim or claims made against it shall . . . be the amount stated in Item 3 of the Declarations which shall be the maximum liability of the Insurer in

---

[3]The policy defines "loss" as "any amount which the insureds are legally obligated to pay for a claim or claims made against them for Wrongful Acts, and shall include damages, judgments, settlements, costs, charges and expenses (excluding salaries of officers or employees of the Company) incurred in the defense of actions, suits or proceedings and appeals therefrom; provided always that such subject of loss shall not include fines or penalties imposed by law or other matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed."

(a) each policy year . . . ." Item No. 3 of the declarations in turn reads: "LIMIT OF LIABILITY: $10,000,000 each policy year . . . ."

Finally, endorsement No. 3, captioned "COSTS, CHARGES AND EXPENSES AND DEFENSE INCLUDED IN LIMIT OF LIABILITY," replaces the predecessor clause No. 6 (captioned only "COSTS, CHARGES AND EXPENSES AND DEFENSE") in its entirety. It states in pertinent part that when payment not exceeding "the Limit of Liability has to be made to dispose of a claim, costs, charges, expenses and settlements shall be payable up to the Limit of Liability . . . ."[4]

From these provisions it is apparent that the term "loss" is the dollar amount which a director or officer must pay for a claim, and that such amount embraces damages as well as the costs of defense. It is further apparent that National Union's maximum liability for claims is $10 million in each policy year. Finally, when payment not exceeding the limit of liability must be made to dispose of a claim, costs, charges expenses and settlements are payable up to the limit of liability. We agree with National Union that these provisions are clear and reasonably mean only one thing: *defense costs accrue against the policy's limit of liability.*

Plaintiffs first counter that the issue whether the D&O policy is self-consuming is moot because defense costs have been paid from and allocated to the CGL policy, and the D&O policy expressly excludes coverage for payment on claims insured by another policy. They rely on testimony and a colloquy between the court and National Union's counsel during the Chatton trial. This testimony showed that some $23 million apparently was booked to the CGL policy. However, prior to the court's ruling on the self-consuming issue in this case, some $1.5 million was charged against the D&O policy, and *all* costs of defending directors against criminal proceedings have been charged against the D&O policy. More importantly, National Union deserves appellate review of the self-consuming issue because the jury in McLaughlin was instructed that the D&O policy was not a wasting asset, and presumably those instructions were taken into account when the jury found National Union liable for bad faith.

---

[4]Endorsement No. 3 reads: "(a) No costs, charges, expenses and settlements shall be incurred without the Insurer's consent which shall not be unreasonably withheld; however, in the event such consent being given, the Insurer will pay, subject to the provisions of Clauses 5(b) and 5(c) [relating to retentions], 95% of all such costs, charges and settlements, subject nevertheless to the following conditions: [¶] (i) If a payment not in excess of the Limit of Liability has to be made to dispose of a claim, costs, charges, expenses and settlements shall be payable up to the Limit of Liability applicable under this policy. [¶] (ii) If the claim is successfully resisted by the Insureds, costs, charges and expenses shall be payable up to but not exceeding the Limit of Liability under this policy."

Plaintiffs next argue that contrary to National Union's assertions, the policy does not link the limit of liability to the term "loss," but rather defines the limit of liability as a ceiling for claims, a term nowhere defined in the policy. This argument is superficial. What we do know about a claim—namely, that it results in a "loss," i.e., an *amount*, with defined components (e.g., damages, defense costs), which the director or officer has to pay for having committed a wrongful act—leads one to conclude that for all practical purposes the concept of a claim is subsumed within the definition of loss.

Plaintiffs further contend that the endorsement No. 3(a)(i) language that costs of defense "shall be payable up to the Limit of Liability" is ambiguous. They posit that it could mean that these costs would be paid separately up to the limit, i.e., there is a $30 million cap on coverage for claims and an additional $30 million cap on defense costs. This is an absurd interpretation——one which could not possibly, let alone reasonably, stem from a policy which defines defense costs as an element of loss and which states in the capitalized title to the endorsement that defense costs are "included in limit of liability."

Then, in their response to the amicus curiae brief of Continental Casualty Company, plaintiffs also argue that endorsement No. 3 completely removes the original paragraph's restriction on defense costs in the present circumstances where payment to dispose of a claim will *exceed* the policy's limit of liability.[5] The original clause provided that in such cases National Union had to pay defense costs *over and above* the limit of liability, but only on a pro rata basis. The new clause per endorsement No. 3 does not specifically address the situation where losses exceed the limit of liability. Thus, plaintiffs urge that the broad language of endorsement No. 3, paragraph (a) applies, requiring National Union to pay 95 percent of all defense costs, there being no other cap.

But there is another cap. Plaintiffs ignore the fact that the broad endorsing language of paragraph (a) also subjects National Union's obligation to pay defense costs to the provisions of clause 5(b), which state that the insurer's

[5]In this same brief plaintiffs point out that contrary to the original policy language, this same endorsement adds a *new restriction* to National Union's obligation to pay defense costs—namely, that when National Union is called upon to pay *less than* the limit of liability, it is no longer required to pay defense costs over and above that limit. The original language read: "If a payment not in excess of the limit of liability has to be made to dispose of a claim, costs, charges and expenses shall be payable *in addition to* the limit of liability otherwise applicable under this policy." (Italics added.)

Plaintiffs' interpretation here goes against the very argument presented in their opening brief and discussed above that the endorsement No. 3(a)(i) language is ambiguous. (The two briefs were prepared by different law firms.)

cap on liability for any claim is $10 million each policy year. They gloss over this connection with the remark that clause 5(b) does not provide any further restriction on National Union's obligation to pay defense costs because it deals with National Union's responsibility for payment of claims! But it is precisely this connection to the cap on liability for losses from claims that defeats plaintiffs' argument—there is $10 million per year, period, to pay for such losses, and under the policy that $10 million can be used for any component of the loss, including damages and defense costs.

Plaintiffs also maintain that National Union knows how to be clear when it wants to, quoting from a revised D&O policy used *after* 1984: The following notice appears at the top of the declarations page: "NOTICE: THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. FURTHER NOTE THAT AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT." We agree that this statement is simpler and clearer than the statement in question. However, the policy, read as a whole, is not legally ambiguous on whether defense costs apply against coverage limits.

Plaintiffs next argue that case law supports their conclusion that defense costs do not deplete policy limits. (Citing *Planet Ins. Co. v. Mead Reinsurance Corp.* (9th Cir. 1986) 789 F.2d 668; *Grunewald & Adams v. Lloyds of London* (Ariz.App. 1985) 700 P.2d 888; *Hertzka & Knowles v. Salter* (1970) 6 Cal.App.3d 325 [86 Cal.Rptr. 23].) These decisions do not aid their cause.

It is true that the reviewing court in each case rejected the insurer's argument that defense costs diminished the insured principal sum. However, it is equally true that in each case there was a linguistic basis for interpreting the policy in favor of the insured on this key point.[6] We do not have an ambiguous policy here, and the language plainly provides that defense costs

---

[6]For example, in *Planet Ins. Co. v. Mead Reinsurance Corp., supra,* 789 F.2d 668, the insurer committed to indemnify the insured municipality for "Ultimate Net Loss" not exceeding the policy limits. The policy defined "Ultimate Net Loss" as "(1) The sum actually paid . . . in the settlement or satisfaction of losses . . . , (2) and includes attorney's fees, court costs and interest on any judgment or award . . . ." Interpreting the clause as a whole, the court concluded that attorney fees meant fees paid to a third party claimant and, thus, defense fees were not subsumed within the liability limits. (*Id.,* at pp. 671-672.) In contrast, National Union's policy defines loss as including "costs, charges and expenses . . . incurred *in the defense* of actions" including "attorney's fees." (Italics added.)

And in *Grunewald & Adams v. Lloyds of London, supra,* 700 P.2d 888, the policy in question applied its liability limits to claims, including "costs and expenses incurred in connection therewith . . . by or on behalf of the Assured"; it also gave the insurer the right to take over and conduct the litigation. The reviewing court held that these provisions reasonably permit the interpretation that defense costs are incurred on the insurer's own behalf and in its

count towards the limit of liability. For this same reason, we need not delve into plaintiffs' arguments concerning the reasonable expectations of the insureds. (*Lumbermens Mut. Cas. Co.* v. *Vaughn* (1988) 199 Cal.App.3d 171, 179 [244 Cal.Rptr. 567]: "It is settled in this state that 'the doctrine of reasonable expectation of coverage comes into play *only* where there is an ambiguity in the policy.' ")

## III. FIRST YEAR CLAIMS

National Union next attacks the trial court's ruling that $10 million was available under the policy for first year claims. Its argument is threefold: There were no claims made in the first year because (1) no investor demanded money or services on account of a wrongful act; (2) no investor asserted liability against an individual officer or director; and (3) no one gave notice to National Union of any claim.

### A. *Findings and Judgment Below*

The trial court referred the factual issue of first year claims to a special master who heard testimony from 24 investors. Each testified that he or she attempted to liquidate an investment during the first policy year. Typically, the investor contacted the officer[7] familiar with the account and instructed that officer to liquidate. Typically, the investors had been assured by an officer of the company that their investments were liquid and could be cashed out easily. In some cases the investors wanted to liquidate for personal reasons; many were displeased with the company and/or the performance of the particular security. Repeated attempts were made to move the officer to liquidate. In a few cases the investor obtained partial liquidation but in most cases none.

---

self-interest. (*Id.*, at p. 890.) Again, this policy explicitly includes defense costs in the liability limits. This is in keeping with the insurer's limited defense role—one of giving reasonable consent to incurring such costs and to contesting a legal proceeding, and mutually agreeing to selection of counsel.

Similarly, in *Hertzka & Knowles* v. *Salter, supra,* 6 Cal.App.3d at page 326, the policy defined the "measure of loss"—to which the policy limits applied—as the "amount as may be assessed against the assured either by arbitration, adjudication, or as the result of a lawsuit, together with all costs or expenses incurred in connection therewith . . . ." The insurer, in settling with the insured, tried to deduct costs and expenses incurred on its own behalf *after* rejecting (with the insured's knowledge and without objection) a settlement offer that was within the policy limits. The Court of Appeal determined that the policy was reasonably open to the interpretation that the measure of loss only included costs or expense in connection with proceedings taken by, or on behalf of, the insured. Instead, the insurer rejected arbitration and then assumed exclusive control over the arbitration, which resulted in greater liability to the insureds. (*Id.*, at pp. 333-334.)

[7]In one case the investor dealt with an officer's secretary because the officer would not return telephone calls. In two or three other cases, the investors dealt with an account representative who was not an officer or director.

The special master concluded that there was sufficient evidence "to support a finding of liability for claims made during the first policy year." His "tentative decision" was incorporated into the final judgment. That decision states in part: "Each first year claimant was dissatisfied in some manner with the performance of his or her Technical Equities investment. This dissatisfaction led in turn to a claim made against one or more of the insured T.E. officers. Subsequent events have shown that poor performance of T.E. investments during the first policy year was the result of acts and omissions of the insureds. The causal connection between their wrongful acts and the claims is clear. [¶] [T]he first year claimants 'did not threaten suit, suspect or accuse an officer of misconduct or otherwise allege wrongdoing.' . . . A statement of wrongdoing by a claimant is not however a prerequisite for coverage. [¶] Although the policy may require a causative connection between wrongful acts and a claim, the ability of the claimant to articulate such a connection is not essential. To expect a claimant to do so would be unrealistic, especially in a complex situation such as existed here. . . . Requiring a claimant to identify the insured's wrongful acts at the time of the claim would serve no purpose other than tending to defeat coverage in most of the cases for which these policies are written. The court rejects such an interpretation of the policy."

### B. *"Claims Made" Policy*

 ██ ██ The National Union policy is a "claims made" policy,[8] identified as such on the declarations page. The insuring clause specifically commits National Union to pay (1) *against loss*, (2) *arising from any claim* or claims *first made against the insureds during the policy period*, and (3) by reason of any *wrongful act* in their capacities as officers or directors.

 The parties strongly disagree on whether there is substantial evidence to support the finding that claims were made against directors and officers during the first policy year. We need not resolve this conflict because we agree with National Union that there can be no compensable first year claims absent notice thereof by the insureds or the company in that year. No one—not the company, the directors or officers, or the investors—reported a claim to National Union during the first policy year.

[8]The difference between "claims-made" and "occurrence" policies has to do with the insured risk. Under a "claims-made" policy, the insurer generally is responsible for loss resulting from claims made during the policy period no matter when the liability-generating event took place. Under an "occurrence" policy, the insurer generally is responsible for loss resulting from acts that occur during the policy period, even if the claim is made after the policy expires. (See *Burns* v. *International Ins. Co.* (9th Cir. 1991) 929 F.2d 1422, 1424, fn. 3; *Merrill & Seeley, Inc.* v. *Admiral Ins. Co.* (1990) 225 Cal.App.3d 624, 628 [275 Cal.Rptr. 280].)

## C. *Notice*

Clause 7(a) of the policy, captioned "Loss Provisions," states: "The time when a loss shall be incurred within the meaning of this policy shall be the date on which the Company . . . or the Insureds shall give written notice to the Insurer as hereafter provided." It further provides that as a condition precedent to the insureds' right to be indemnified, the company or the insured must "give to the Insurer notice as soon as practicable in writing of claims made upon the Insureds." Finally, the declarations page and limit of liability clause set National Union's maximum liability for any claim or claims at $10 million each policy year.

 From these provisions, National Union asserts there is no insured loss until notice is given and, thus, whether there is coverage in any one policy year depends upon when or if that notice is given.[9]

Plaintiffs counter that nowhere does the policy say that the insureds must give notice to National Union during a policy year in order for coverage to apply for that year. They insist the policy language does not shed light on the importance of the timing of when a loss is incurred, nor does it link that time with the $10 million limit of liability per policy year or explain the significance of that limit. They point out that the insuring clause provides coverage for losses arising from claims made *during the policy period against the insured,* not for claims reported to the insurer during the policy period, although written notification at some unspecified point in time is a condition precedent to indemnification.

The policy is not crystal clear, and plaintiffs are right that it does not expressly state what National Union contends it means, namely, that there is $10 million of coverage per policy year for claims made against the insured *and reported* to the insurer. The surface lack of clarity lies in the fact that the insuring clause defines National Union's liability in terms of loss (the insurer must pay *"against loss"* arising from claims "made *during the policy period"*), whereas the limit of liability endorsement is phrased in terms of maximum liability *in a policy year* for *claims* made against it. Tacked on in clause 7 is the concept that loss is incurred upon notice to National Union.

Nonetheless, the policy, taken as a whole, is not ambiguous. First, we have already explained that the policy definition of "loss" directly links covered

---

[9]The trial court concluded that "[u]nder the law a claim is 'made' when it is made to the insured, TE, not when notice is given to the insurance company," citing *Phoenix Ins. Co.* v. *Sukut Construction Co.* (1982) 136 Cal.App.3d 673 [186 Cal.Rptr. 513]. *Phoenix* does so *assume,* but there is absolutely no indication that the policy in *Phoenix* contained loss or notice provisions similar to the ones involved here. A case which does not even discuss or quote the operative provisions is not precedent for subsequent judicial interpretation of language in another insurance policy.

losses to claims. Therefore, the annual limits of liability apply to losses arising from claims. Second, since under the policy National Union is only liable for "losses," what matters for purposes of tapping into that annual limit of liability is when a loss occurs. Clause 7(a) tells us that losses occur on the date the company or insured gives written notice to National Union of a claim. Third, the insuring clause itself, which establishes National Union's responsibility to pay against loss, is subject to all the conditions of the policy, including the clause 7 "loss provisions" and the annual limits of liability. There would be no purpose in tying loss to the timing of notice of a claim and, thus, no purpose to clause 7(a), if it did not function to allocate losses from claims against the annual limit of liability. Our Civil Code section 1641 states it well: "The whole of a contract is to be taken together, *so as to give effect to every part*, if reasonably practicable, each clause helping to interpret the other." (Italics added.)

### D. *Notice-prejudice Rule*

Plaintiffs also invoke California's "notice-prejudice" rule, arguing that in order to avoid coverage on notice grounds, National Union must (but did not) demonstrate actual and substantial prejudice arising from delay in receipt of notice. The notice-prejudice rule operates to prevent an insurance company from denying coverage based on a breach of the policy's notice requirements unless the insurance company shows actual prejudice from the delay. (See *Campbell* v. *Allstate Ins. Co.* (1963) 60 Cal.2d 303, 306 [32 Cal.Rptr. 827, 384 L.Ed.2d 155].) This rule developed in the context of "occurrence" policies such as the automobile liability policy at issue in *Campbell*. (See *Pacific Employers Ins. Co.* v. *Superior Court* (1990) 221 Cal.App.3d 1348, 1357 [270 Cal.Rptr. 779] and cases cited therein.)

California courts are of two minds as to whether the "notice-prejudice" rule applies to claims-made policies. In 1970, this district said it did, relying on *Campbell* and refusing to analytically distinguish occurrence from claims-made policies. (*Northwestern Title Security Co.* v. *Flack* (1970) 6 Cal.App.3d 134, 143-144 [85 Cal.Rptr. 693].) More recently, a federal district court has followed suit, also applying *Campbell* and the notice-prejudice rule to a claims-made policy without analysis. (*Mt. Hawley Ins.* v. *Federal Sav. & Loan Ins. Corp.* (C.D.Cal. 1987) 695 F.Supp. 469.)

*Flack* and *Mt. Hawley* do not concern the interplay between notice and *coverage*, and do not discuss the notice-prejudice rule in terms of the special features of a claims-made policy or the type of policy language at issue here. Rather, they deal with whether the insurer can *defend* on the basis of breach of the notice provisions.

The court in *Pacific Employers Ins. Co. v. Superior Court, supra,* 221 Cal.App.3d 1348, saw the distinction between "occurrence" and "claims made" policies as critical to evaluating whether to apply the notice-prejudice rule. (At p. 1357.) As it explained, in classic occurrence policies, coverage attaches when the occurrence takes place even though a claim is lodged at a later time. Notice provisions in these policies serve to aid the insurer in investigating, settling and defending claims, not as a definition of coverage. (*Id.,* at p. 1358.) The court went on to hold that applying the notice-prejudice rule to the claims-made policy at hand—which covered claims made and reported during the policy period—would improperly convert that policy into an occurrence policy. In such policies, coverage itself depends on reporting the claim to the insurer during the policy period. To allow a reporting extension beyond the policy period would be to rewrite the policy with an extension of coverage at no extra cost to the insured. (*Id.,* at pp. 1358-1359; accord, *Slater v. Lawyers' Mutual Ins. Co.* (1991) 227 Cal.App.3d 1415, 1421-1423 [278 Cal.Rptr. 479]; *Burns v. International Ins. Co., supra,* 929 F.2d at p. 1425 [expressing the belief that the California Supreme Court would not apply the notice-prejudice rule to claims-made policies].)

Plaintiffs characterize the policies in *Slater* and *Pacific Employers* as "claims made and reported" policies, as contrasted with a pure "claims made" variety which they contend accurately reflects the National Union D&O policy. Whatever label one wishes to use, we have resolved that this policy contains a reporting element essential to coverage because, according to its terms, a loss, which triggers coverage, does not occur until notice of the underlying claim is given.

In any event, we line up with the reasoning expressed by the courts in *Pacific Employers* and *Slater.* Clause 7(a) makes notice an element of coverage; the issue is not one of failure to give timely notice. Subjecting this policy to the notice-prejudice rule would materially alter the insurer's risk. The hallmark of a "claims made" policy is that exposure for claims terminates with expiration or termination of the policy, thereby providing certainty in gauging potential liability which in turn leads to more accurate calculation of reserves and premiums. The benefit to the insureds is that the insurer can make coverage more available and cheaper than occurrence policies. (See *Pacific Employers Ins. Co. v. Superior Court, supra,* 221 Cal.App.3d at pp. 1359-1360.)

### E. *Coverage for Potential Claims*

Under National Union's policy, coverage also extends to actual claims arising from potential claims which are reported to the insurer during the

policy period.[10] Clause 7(c) assures a "tail" of coverage for situations that have not yet ripened into claims against directors and officers during the policy period but which the insureds expect will develop into full-blown claims down the road. National Union concedes that it received comprehensive notice in the second policy year which satisfies the reporting requirements of paragraph 7(c) and which advised it of all occurrences which might give rise to claims.[11]

■ Plaintiffs maintain that by classifying subsequent, actual claims arising from a reported occurrence as claims "made during the currency" of the policy period—rather than during the policy year in which notice was given—clause 7(c) eliminates the concept of distinct policy years and the attendant limit of liability per policy year. In its place steps the broader concept of the policy period. Under their analysis, the second year notice of potential claims converts the annual limit of liability *into an aggregate $30 million in coverage for the three-year period* and, thus, it becomes irrelevant whether *actual* claims were made in the first year. They remind us that Technical Equities prepaid a three-year premium of $30,290 for coverage during the three-year policy period and that the insuring clause guarantees coverage against loss "arising from any claim or claims which are first made against the Insureds . . . *during the policy period . . . .*" (Italics added.)

Plaintiffs highlight as supporting their position the only reported decision discussing National Union's clause 7(c) language—*National Union Fire Ins. Co.* v. *Ambassador Group* (E.D.N.Y. 1988) 691 F.Supp. 618. The question in *Ambassador Group* was how much should National Union interplead to resolve multiple claims asserted against directors and officers covered by a

[10]In particular, paragraph 7(c) provides: "If during the policy period . . . : [¶] (i) the Company . . . or the Insureds shall receive written or oral notice from any third party that it is the intention of such third party to hold the Insureds responsible for the results of any specified Wrongful Act by the Insureds while acting in the capacities aforementioned; or [¶] (ii) The Company . . . or the Insureds shall become aware of any occurrence which may subsequently give rise to a claim being made against the Insureds in respect of any such Wrongful Act; and [¶] shall in either case, during such period give written notice to the Insurer of the receipt of such written or oral notice under (i) above or such occurrence under (ii) above, then any claim which may subsequently be made against the Insureds arising out of such Wrongful Act shall for the purpose of this policy be treated as a claim made during the currency hereof."

[11]Specifically, on January 30, 1986, Senior Vice-President Craig Foster advised National Union by letter that in the wake of certain disclosures set forth in a press release issued the previous week, Technical Equities received "many phone calls from disgruntled investors" and "some [may] have consulted counsel." The letter goes on to state: "We are not aware of any lawsuits that have been filed at the present time. However, we want to give you notice of this occurrence because it may give rise to claims being made against this company, its subsidiaries, officers and directors under the policy of directors' and officers' liability insurance issued by National Union to Technical Equities."

three-year policy with liability limits of $3 million each policy year. National Union received notice of claims in both the first and second policy years. It characterized the first year notice as alerting it to " 'a wide range of alleged wrongful conduct by directors and officers of Ambassador Group . . . which caused [the company's] demise . . .'" and insisted that all second year claims related back to this notice. (*Id.*, at p. 621.) From this National Union apparently argued that it could limit its liability for subsequent claims to the limit of liability for the first policy year when it received in-depth notice of alleged wrongdoing.

The court in *Ambassador Group* rejected National Union's contention that clause 7(c) restricted its liability to $3 million for one policy year rather than the $6 million plaintiffs claimed was available. It explained: "This paragraph thus provides for certain limited instances in which a claim that is subsequently made will relate back to prior notice of an occurrence. If the Company becomes aware of and gives the Insurer written notice of an occurrence that may give rise to a claim, then any claim subsequently made 'will be treated as a claim made during the *currency hereof*' (italics added). Significantly, this provision does not indicate that the claim will relate back to the specific policy year during which notice of an occurrence was given, but, rather, more generally provides that the subsequent claim will be treated as a claim made during the currency of the policy. Thus, the provision appears to be designed to protect the insureds. If they notify the insurer of an occurrence that may give rise to a claim, and the claim is not actually asserted until after the Policy expires, then the claim will relate back to the 'currency' of the Policy. [¶] The construction that National Union attempts to give this provision is strained and inconsistent with the plain terms of the Policy. . . . [Its] interpretation, taken to an extreme, would effectively permit National Union to limit its maximum aggregate liability to three million dollars rather than the nine million dollars provided for in the Policy." (*Ambassador Group, supra,* 691 F.Supp. at p. 623.)

Plaintiffs charge that clause 7(c) at best is ambiguous because it leaves open the question of how to allocate claims made after a notice of occurrence, echoing the *Ambassador Group* court. ("The language in paragraph 7(c), however, is at best ambiguous. In such a situation, it is axiomatic that the Policy is to be construed against the insurer." (*Ambassador Group, supra,* 691 F.Supp. at p. 623.) Plaintiffs are right that clause 7(c) does not tell us how to allocate subsequent claims. However, they seem to forget that clause 7(a) tells us that *all losses* under the policy are incurred on the date notice is given. This is a *general* loss provision which, by referring to the giving of written notice "as hereinafter provided," encompasses both the notice of claims (clause 7(b)) *and* the notice of occurrences (clause 7(c)). Plaintiffs'

argument and the decision in *Ambassador Group* completely ignore the effect and meaning of clause 7(a).

Note, however, that we do not agree with the use to which National Union wishes to put this clause, namely, that all losses stemming from actual second *and third year* claims would be funneled into the second policy year because that is when Technical Equities gave comprehensive notice of occurrences. Thus, National Union asserts there is no third year coverage because the second year report attributes all subsequent claims and losses to that year.[12]

National Union loses this argument because it imposes a hierarchy on the notice provisions that defeats coverage. Clause 7 details the notice requirements for actual and potential claims. We have both in this case—second year notice of potential claims, and second (and third year)[13] notice of actual claims.

Is the notice of occurrence provision superior to the notice of claim provision? Clause 7(a) tells us to attribute loss to the date of notice, but does not tell us how to resolve competition between the two types of notice. We must resolve this ambiguity in favor of the insureds. Therefore, we conclude the concept of subsequent claims developed in clause 7(c) for all practical purposes refers only to claims made *after* the policy expires and, thus, this provision is inapplicable to claims made during the policy period. (See *Ambassador Group, supra,* 691 F.Supp. at p. 623 [framing its discussion of "subsequent claims" in terms of claims asserted after the policy expires].) This construction is in keeping with the purpose of a coverage tail, namely, to ensure that losses arising from certain claims made after the policy expires will be treated as covered losses under the policy. Moreover, if clause 7(c) were read as encompassing all claims made after a comprehensive occurrence notice—whether made before or after expiration of the policy—it

---

[12]National Union also attempts to bolster its position by referring us to the "interrelated acts" provision of clause 5(c) which states that "losses arising out of the same or interrelated acts of one or more of the Insureds shall be considered a single loss . . . ." The policy declarations, as amended, provide for a $5,000 retention per director or officer, subject to a maximum of $7,500 per loss. Clause 5(c) goes on to state that the $5,000 per director/officer retention applies separately to each such person for each loss and where the "per loss" maximum retention applies, that retention is to be prorated among the insureds in proportion to their respective losses. In context it is clear that the interrelated acts provision pertains solely to calculation of the retention amount to be borne by the insureds and not to the issue of when loss is incurred for purposes of applying the annual limit of liability for a particular policy year. The court in *Ambassador Group* arrived at the same conclusion when responding to a similar argument based on similar language. (*Ambassador Group, supra,* 691 F.Supp. at p. 622.)

[13]National Union has never argued that it did not receive notice of third year claims.

would be meaningless and redundant. A claim made during the policy period *is* "made during the currency" of the policy period and there is no need to treat it specially.

Finally, National Union, trying to argue fairness and common sense, explains that by assigning all claims to the policy year in which notice of the occurrence was given, the policy limits of subsequent years are preserved for unrelated claims. Thus directors and officers who are vicariously liable or who are not involved in a reported occurrence are assured that their coverage will not be reduced or eliminated by the wrongful acts of other directors and officers who reported occurrences in a prior policy year. In certain limited situations this might be the case, depending on whether claims are actually made based on the reported occurrence, whether those claims are lodged before other directors and officers can lodge their claims, and whether those claims absorb all the coverage. The policy, however, simply does not attempt to establish a "per occurrence" cap on losses or otherwise ration coverage among the various insured directors and officers. Needless to say, National Union's apparent concern about preserving coverage for other directors and officers is self-serving—the impact of its argument in this case is to eliminate an entire year of coverage—not to preserve it for someone else.

## IV. THIRD YEAR COVERAGE

National Union finally protests the trial court's ruling on third year coverage. It advances several theories. We have already rejected the contention that all lawsuits filed in the third year are subsumed under the second year because they were preceded by a comprehensive notice of occurrences in that year. The remaining arguments center on the proposition that the policy was properly cancelled in the bankruptcy proceeding before inception of the third policy year, therefore precluding any scrutiny here of the propriety or effect of cancellation.

### A. *Factual Background*

The policy gives National Union the right to cancel upon 30 days' written notice to Technical Equities. The policy also directs the company to act on behalf of the insured directors and officers with respect to the giving and receipt of notice of cancellation.

In May 1986—three months after Technical Equities filed for protection under the Bankruptcy Code—National Union gave written notice of cancellation effective the following month. At that time it also denied the existence

of coverage for acts of officers and directors of Technical Equities *as debtor in possession* (DIP). A dispute arose as to whether National Union could deny coverage to DIP officers and directors and whether cancellation would violate the automatic bankruptcy stay. At the June 10, 1986, meeting of the board of directors of Technical Equities, the board resolved "to negotiate with National Union . . . and accept *a continuation of the present officers' and directors' liability policy* for a period of at least 12 months at the coverage amount of $5,000,000 if no addition premiums need be paid." (Italics added.)

Counsel for National Union and Technical Equities then struck a deal whereby National Union would *cancel* the existing policy and issue a new policy covering postbankruptcy acts of directors and officers of the DIP. National Union would also provide coverage for a period of extended discovery for prepetition acts as provided, upon election, under the original policy. The premiums for the new policy and for extended discovery would equal the unearned premium on the cancelled policy.

Counsel for the two entities then moved for an order approving the compromise and served notice of the hearing to the directors and officers of Technical Equities (or their attorneys) and others.

On July 28, 1986, the Honorable Lloyd King of the United States Bankruptcy Court, Northern District of California, held a short hearing on the motion and two other Technical Equities matters. None of the directors or officers appeared personally or through counsel at this hearing. Counsel for Technical Equities briefly described the compromise and asked for the court's approval. The court asked about coverage for claims based on prepetition conduct. Counsel explained that claims made until cancellation would be covered under the old policy and subsequent claims based on prepetition acts made within a year of cancellation would be covered under the extended discovery clause.[14] However counsel did *not* explain that under the policy, these postcancellation claims would be allocated to the liability limits for the second policy year. On August 5 the court filed its order approving the compromise.

Thereafter, National Union went to federal district court in an unsuccessful attempt to halt enforcement of any judgment that might be entered against it in this case and the coordinated bad faith actions. National Union claimed the bankruptcy order barred entry of any judgment against it for bad faith to the extent the judgment was predicated on coverage for the cancelled policy period. The Ninth Circuit Court of Appeals summarily affirmed the district court's decision.

---

[14]In fact, the discovery clause provided for six months' extended coverage.

Judge Rushing in this action determined that the compromise was not binding on plaintiffs or the officers and directors. His ruling centered on the constitutional inadequacy of notice for the motion to approve the compromise. He also concluded that National Union's attempt to cancel the policy was "arbitrary and without legal justification." In the subsequent McLaughlin v. National Union bad faith action, the trial court instructed the jury: "Cancellation of the third year of the D&O policy was invalid, and had no effect on plaintiffs herein, a bankruptcy order to the contrary notwithstanding." Prior to this appeal, National Union sought extraordinary relief here, to no avail. The Supreme Court denied review.

National Union launches a broad-based attack on the trial court's decision on third year coverage. Its opening assertion is that we should honor the "consensual" cancellation between itself and Technical Equities, DIP. It then argues that none of the injured investors have vested rights in the liability limits of the third policy year because the policy was cancelled before any third year claims could be made and reported. Third, National Union maintains the present declaratory relief action is an impermissible collateral attack on the bankruptcy court order approving the compromise. Finally, it asserts that any party who received notice of the July 28 hearing, including any officer or director, could have challenged the compromise but did not. As to these people and their privies, including plaintiffs, National Union contends the bankruptcy order is res judicata. We take these arguments in order and conclude with an analysis of the plaintiffs' claim that National Union pursued cancellation in bad faith.

### B. *"Consensual" Cancellation*

National Union first maintains that we should respect the "consensual" cancellation between itself and Technical Equities, DIP because it comported with all policy requisites. It reminds us that the policy gives the carrier and the insured company the mutual right to cancel—the company at any time by written notice or surrender of the policy, the carrier by 30-day written notice. Since nowhere is notice to the directors and officers called for, National Union contends that should end this matter.

Not so. Compliance with contractual provisions governing cancellation does not seal the legal validity of National Union's actions in pursuing cancellation.

Notwithstanding National Union's argument to the contrary,[15] this lawsuit has raised the issue of whether National Union's conduct amounted to a breach of the covenant of good faith and fair dealing. This question has nothing to do with whether, as a private contractual matter, the former directors and officers were entitled to notice. Rather, it has everything to do with whether National Union acted in good faith as to the directors and officers. National Union tries to portray these two matters as coterminous and contradictory when they are not.

## C. *Vested Rights*

National Union next urges that plaintiffs and other injured investors have no standing to question the order approving the compromise because they have no vested rights in the policy's third year coverage. This is so, it argues, because the policy was cancelled during the second year, before anyone could assert, let alone report, a claim which would tap the liability limits of the third policy year. National Union's argument is flawed. It is the directors and officers who have standing to raise the issue of third year coverage, the ultimate question being whether the compromise and cancellation cut off their rights to the liability proceeds for that policy year. If, as is the case, the answer is no, then the former directors and officers have $10 million in third year coverage which is available to pay for losses of third year claimants.

For purposes of standing to bring this declaratory relief action, plaintiffs have an "interest" in determination of the issue of third year coverage because they are direct assignees of a portion of the right, title and interest of certain former directors in the policy. (Code Civ. Proc., § 1060: "Any person interested . . . under a contract, or who desires a declaration of his rights or duties with respect to another . . . may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action . . . for a declaration of his rights and duties in the premises. . . .") The former officers and directors, in turn, were nominal defendants in this action. Many of them cross-complained against National Union seeking, among other relief, a declaration as to outside limits of the policy. They participated throughout the proceedings and it was efficient and proper for the court to declare the extent of coverage available to them under the policy, including the third policy year thereof.

---

[15]National Union states: "Plaintiffs' contention that the cancellation was invalid because National Union acted in bad faith . . . was never raised or tried or determined in this case." National Union must realize that the validity of its actions in pursuing cancellation was a pivotal issue below. In their pretrial statement, plaintiffs highlighted the undisputed and disputed facts going to this issue and briefed the matter in the trial court. Moreover, much of the evidence offered at trial went to this issue. Finally, National Union itself in its proposal on issues to be decided framed the question: "Was cancellation valid?"

### D. *Collateral Attack*

 The bankruptcy court order approving the compromise is final—no one appealed from it or brought a direct attack seeking relief from the order. National Union maintains that the instant declaratory relief action is an impermissible collateral attack on that order and an abuse of the principle of judicial comity.

We do not classify this lawsuit as a collateral attack on the bankruptcy order. Rather, plaintiffs are seeking a declaration that the insureds are entitled to the liability limits of the third policy year precisely because the bankruptcy order did not impact or determine rights as between the insurer and its insureds.[16]

 Bankruptcy proceedings operate in rem (*Levy* v. *Cohen* (1977) 19 Cal.3d 165, 172 [137 Cal.Rptr. 162, 561 P.2d 252]) and, thus, orders rendered therein with respect to the debtor's property are conclusive upon the whole world (see *Gratiot County State Bank* v. *Johnson* (1919) 249 U.S. 246, 248 [63 L.Ed. 587, 588]). For the very reason that the compromise order was in rem, its scope necessarily was narrow, confined to the policy itself. While it may be that the policy belongs to Technical Equities and, thus, is part of the estate, the liability proceeds thereunder do not. This is because D&O policies do not provide coverage for claims against the corporation itself; they provide reimbursement to the corporation for its indemnification of individual officers and directors. The liability proceeds belong directly to the officers and directors. (*In re Louisiana World Exposition, Inc.* (5th Cir. 1987) 832 F.2d 1391, 1399-1400.)

Therefore, while the results of the order were to approve a cancellation agreed upon between National Union and Technical Equities, DIP and set in place a new policy covering the directors and officers of the DIP, the order did not cut off or determine the preexisting rights of the former directors and officers to the policy proceeds, or alter the preexisting duties of National Union to its insureds. These rights and duties have nothing to do with the debtor's property. The insureds had a preexisting right to third year coverage absent a good faith cancellation. If, as the trial court found, National Union did not act in good faith in seeking cancellation, it follows that the directors and officers remain entitled to the benefits of third year coverage.

Recently, the Ninth Circuit, in a somewhat similar situation, rejected the argument that a third party's declaratory relief suit was a collateral attack on

---

[16]Plaintiffs have argued that the bankruptcy order is void because it violated the automatic stay. The trial court did not decide this issue, nor do we.

a bankruptcy court order approving a settlement agreement between the debtor and its bank: "This argument much over-states what the order of the bankruptcy court did. The bankruptcy court authorized [the debtor] to settle with the Bank of America. It did not purport to determine the effect of the settlement on Teerlink's lots. . . . There was nothing in the agreement and a fortiori nothing in the order of the bankruptcy court that barred Teerlink from seeking the declaration the district court issued. . . ." (*In re Teerlink Ranch Ltd.* (9th Cir. 1989) 886 F.2d 1233, 1236.)

So, too, the bankruptcy court order here did not purport to determine the rights of the insured directors and officers under the policy. Thus we conclude that the real issue framed by this lawsuit is not whether it is an impermissible collateral attack on a final bankruptcy court order, but whether the doctrine of res judicata bars plaintiffs' efforts to raise the issue of National Union's bad faith.

### E. *Res Judicata Analysis*

■■■■ A judgment or order of a bankruptcy court, once rendered, is final for purposes of res judicata until reversed or modified on appeal or set aside in the rendering court. (*Levy* v. *Cohen, supra,* 19 Cal.3d at p. 172.) The doctrine of res judicata will prevent readjudication of all matters which were, or might have been, litigated in the earlier proceeding between the same parties. (*Chicot County Dist.* v. *Bank* (1940) 308 U.S. 371, 375 [84 L.Ed. 329, 333, 60 S.Ct. 317].) On the other hand, "an adjudication in bankruptcy, like other judgments *in rem*, is not res *judicata* as to the facts or as to the subsidiary questions of law on which it is based, except as between parties to the proceeding or privies thereto." (*Gratiot County State Bank* v. *Johnson, supra,* 249 U.S. at p. 248 [63 L.Ed. at p. 588].)

No one disputes that issues concerning the directors' and officers' rights to the third year policy proceeds, and National Union's corresponding obligations, were not litigated at the compromise hearing. Three issues are disputed: whether the directors and officers *could have* litigated these matters; whether plaintiffs could have contested the compromise; and whether plaintiffs' interests were represented by others present at the hearing.

### (1) *Directors & Officers*

Plaintiffs assert some claims against National Union as assignees of the directors and officers and, therefore, they are privies of the insureds. (See *Woolett* v. *American Employers Ins. Co.* (1978) 77 Cal.App.3d 619, 625 [143 Cal.Rptr. 799].) If the directors and officers are held to be parties to the

compromise proceeding, then neither they, nor plaintiffs through them, can adjudicate the lawfulness of National Union's conduct here because they could have raised the issue in the earlier proceeding. National Union takes the position that the directors and officers were parties because the notice of motion was constitutionally adequate to alert them that their personal interests might be affected and, therefore, they should attend the hearing to object. True, the officers and directors technically are "parties" to the overall bankruptcy proceeding because they are creditors whose rights in the debtor's property will be conclusively determined therein. (See *Levy* v. *Cohen*, *supra*, 19 Cal.3d at p. 172.) However, as we explain, for purposes of res judicata analysis, they were not parties who could be held to have litigated *anything* in the compromise proceeding with respect to their personal rights to the third year policy proceeds because the notice of motion was not a notice that their personal interests were at stake.

The notice recited that: (1) The policy was for the period August 5, 1984, to August 5, 1987; (2) Technical Equities "paid the entire premium due for the three years covered by the Policy, which contained a $10,000,000 liability limit, subject to specified terms and conditions"; (3) "The compromise set forth in the Motion is in the best interest of the estate and creditors"; (4) Technical Equities will agree that the policy is cancelled effective July 13, 1986; (5) National Union will agree to issue a new policy covering acts of the officers and directors of Technical Equities, DIP arising after the bankruptcy and to provide one year extended discovery under the old policy; (6) the unearned premiums would be allocated to the cost of the new policy and the discovery tail; (7) "The complete terms of the compromise are set forth in the Motion. Copies of the Motion and the exhibits thereto, including the Policy . . . are on file with the court"; and (8) "Any interested party that objects to the Motion must file with the court . . . written notice of any objections . . . within ten (10) days after service of this notice."

National Union first calls attention to *Matter of Gregory* (9th Cir. 1983) 705 F.2d 1118, and other cases treating the issue of adequacy of notice in bankruptcy proceedings. *Gregory* concerned notice of a creditor's meeting and confirmation hearing. A copy of the debtor's plan was not included with the notice, and the notice itself was "not unambiguous." The plaintiff, holder of a large unsecured claim, did not attend the meeting and the plan was confirmed.

The court in *Gregory* held that when a creditor "receives any notice from the bankruptcy court that its debtor has initiated bankruptcy proceedings, it is under constructive or inquiry notice that its claim may be affected, and it ignores the proceedings to which the notice refers at its peril. 'Whatever is

notice enough to excite attention and put the party on his guard and call for inquiry, is notice of everything to which such inquiry may have led. When a person has sufficient information to lead him to a fact, he shall be deemed to be conversant of it.' [Citations]. . . . If Lawrence had made any inquiry following receipt of the notice, it would have discovered that it needed to act to protect its interest." (*Matter of Gregory, supra,* 705 F.2d at p. 1123.)

Similarly, a bankruptcy court recently explained that a notice under Federal Rules of Bankruptcy Procedure, rule 2002[17] is not intended or required to fully explain the circumstances of the case—a notice is a notice, not a case history, and details can be obtained by procuring copies of the underlying motion and agreement, as stated in the notice. (*In re Lee Holding Co.* (Bankr. S.D.Ohio 1990) 120 Bankr. 881, 889-890.)

▇▇▇ Citing these and other cases, National Union asserts the directors and officers were on inquiry notice that their interests could be affected; the notice itself indicated that the motion and copies of the policy were on file with the court; had they made inquiry, they would have discovered the need to protect their interests.

Although *Gregory* contains broad language about inquiry notice from documents served in a bankruptcy case, the facts show an unsecured creditor claiming he did not realize he would receive zero payments under the debtor's chapter 13 plan when the actual notice said: " 'The debtors' plan does not propose payment of unsecured creditors.' " (*Matter of Gregory, supra,* 705 F.2d at p. 1120.) In this context, the court's reasoning suggests that the creditor should not have withheld action on the belief that this statement was ambiguous—checking the file, with the actual plan, was in order rather than holding out hope that he would be paid.

Moreover, *Gregory* concerned the initial meeting of creditors and the confirmation hearing on the debtor's plan, the heart of proceedings involving an individual debtor. The notice was the first notice any creditor would personally receive that its debtor had initiated bankruptcy proceedings; whatever plan that was confirmed would bind the debtor and each creditor. (11 U.S.C § 1327(a).) The confirmation hearing affords any party in interest the opportunity to object to confirmation of the plan. (11 U.S.C. § 1324.) How else would the creditor protect his or her unsecured claim but by attending the creditor's meeting and confirmation hearing? Even if the order said nothing about payment of unsecured creditors, under these circumstances the creditor is on inquiry notice that his or her claim is potentially impaired.

---

[17]This rule governs notice on hearings on approval of a compromise or settlement, among other matters.

In contrast, the hearing on the compromise, although a "core" proceeding, was not a required pivotal event in chapter 11 proceedings. Indeed, the agreement itself was described as a compromise *solely* between Technical Equities and National Union. Further, the notice talked about a $10 million liability limit, which suggests a single policy amount, not the potential of three annual limits. Third, there was no hint or suggestion that cancellation could eradicate $10 million in coverage for claims made during the third year based on prepetition acts of officers and directors.[18] Rather, the overall import was that there would be no gaps in coverage because the "one year" extended discovery period would kick in after cancellation, and the successor DIP policy would cover acts occurring thereafter.[19] Fourth, the notice was addressed to "all interested parties," with no specific targeting of the only individuals who National Union now argues were directly impacted by cancellation. Fifth, written objections were to be filed in a short period of time—10 days from service of notice (even Federal Rules of Bankruptcy Procedure, rule 2002 calls for 20 days' notice unless notice is dispensed for cause). Judge Rushing concluded for all these reasons that the notice was constitutionally inadequate to alert the directors and officers that their direct interests as insureds might be at stake to the tune of sacrificing $10 million of third year coverage. In a practical sense there was *no notice* that anyone was challenging or otherwise attempting to adjudicate the rights of officers and directors as insureds under the policy vis-à-vis their insurer. Therefore, these are not matters that "could have been" litigated at the compromise hearing. (*Chicot County Dist.* v. *Bank, supra*, 308 U.S. at p. 375 [84 L.Ed. at p. 333].)

We note that it is the practical effect of notice that carries constitutional significance. When the action involves possible deprivation of an individual's property rights, due process requires that "[t]he notice must be of such nature as reasonably to convey the required information, [citation], and it must afford a reasonable time for those interested to make their appearance . . . ." (*Mullane* v. *Central Hanover Tr. Co.* (1950) 339 U.S. 306, 314 [94 L.Ed. 865, 873, 70 S.Ct. 652].) While the problem in *Mullane*

---

[18]Significantly, Judge King, who approved the compromise, consistently indicated in subsequent rulings that he did not intend the compromise to affect matters of coverage or policy limits—those issues were left to the state court. Moreover, at the initial hearing on the compromise, Judge King inquired as to coverage for claims based on prepetition conduct. Counsel for Technical Equities represented that the compromise transaction was designed so that there would be no coverage gaps—claims made up to termination of the policy would be covered under that policy; the new policy would pick up postpetition acts, and the discovery tail would cover claims based on prepetition acts made subsequent to cancellation. Nothing was said to indicate that coverage would be diminished by one-third based on the cancellation!

[19]Of course, as National Union points out, had the directors and officers procured a copy of the policy and put a microscope to it, they may have figured out that claims reported under the discovery tail would be attributed to the second policy year's liability limits.

was the inadequacy of notice by publication, the ramifications are broader, the mandate being to evaluate whether, "under all the circumstances" notice meets the constitutional reasonableness standard. National Union attempts to construe the notice here as signalling that the directors and officers should appear and protect their individual rights against their insurer. So construed, the notice fails the constitutional standards. As a notice intended to alert creditors in general about the disposition of premium refunds and the insurance status of the DIP—the only legitimate matters that concern the debtor's property and that could possibly interest a creditor *qua* creditor— the notice was adequate.

### (2) *Status as Unsecured Creditors*

In their bad faith action against National Union, plaintiffs also pursue some claims directly against the insurer rather than as assignees of the insured directors and officers. National Union reasons that the order approving cancellation is res judicata even as to plaintiffs when they don their own hats because, as unsecured creditors of Technical Equities, they were parties to the bankruptcy proceedings and are deemed bound by the resulting orders. (Citing *Levy* v. *Cohen, supra,* 19 Cal.3d at p. 172 and *MacArthur Co.* v. *Johns-Manville Corp.* (2d Cir. 1988) 837 F.2d 89.) What it forgets to mention is that the plaintiff in *Levy* had notice of the operative proceeding and an opportunity to litigate his concerns—therefore, the order was conclusive as to him. So, too, the distributor in *MacArthur Co.* received notice before the bankruptcy court approved the settlements in question. Our plaintiffs of course received no notice of *any* bankruptcy proceeding, did not attend the hearing, and were not parties to the compromise agreement itself.

More importantly, while plaintiffs may have claims against Technical Equities in the abstract, the record does not reveal that they have identified themselves as creditors of the company. We find nothing indicating they have filed proofs of claim or otherwise asserted their interests in the bankruptcy proceedings. Instead, they have pursued actions against the negligent corporate officers and directors. Thus, there is no substantial identity of interest between plaintiffs as injured investors and the unsecured creditors who are pursuing and perfecting a claim against the corporation. As to self-identified creditors of the corporation, the compromise would make sense because it favored the debtor's continued existence.

### (3) *Privity with Others*

Finally, National Union urges that res judicata bars plaintiffs' present suit because they were in privity with others who were parties to the compromise

proceeding. "A non-party is in privity with a party for res judicata purposes in three instances. First, if he has succeeded to the party's interest in property . . . . Second, if he controlled the prior litigation . . . . Third, . . . if the party adequately represented his interests in the prior proceeding." (*Latham* v. *Wells Fargo Bank, N.A.* (5th Cir. 1990) 896 F.2d 979, 983.) The California rule is similar: Privity exists where the nonparty has an identity of interest with, and adequate representation by, the party in the first action and the nonparty should reasonably expect to be bound by the prior adjudication. (*Frazier* v. *City of Richmond* (1986) 184 Cal.App.3d 1491 [228 Cal.Rptr. 376].) The broadest theory of nonparty preclusion is that of "virtual representation." This doctrine posits that a person not a party to a prior action nonetheless is bound if his or her interests are so similar to a party's interest that the latter was the former's virtual representative in the earlier action. (*United States* v. *Geophysical Corp.* (9th Cir. 1984) 732 F.2d 693, 697.)

 National Union asserts that plaintiffs were virtually represented by at least four separate parties: the trustee in bankruptcy; counsel for the unsecured creditors' committee; counsel for an uncertified federal class of plaintiffs; and a corporate investor.

What role did these parties play in the compromise? The trustee was not present at the hearing, nor was the motion to approve the compromise spearheaded by the trustee as normally would be the case.[20] The corporate investor was not present, nor is there any indication that this investor was formally acting in a representative capacity. Counsel for the unsecured creditors' committee and for certain federal class action plaintiffs attended the continued hearing on Technical Equities matters, but participated solely in a subhearing on an entirely different issue. Counsel for the unsecured creditors' committee, however, did approve the form of the order.

As noted above, there was no substantial identity of interest between plaintiffs and the unsecured creditors' committee. The same could be said for the plaintiffs and the trustee, who is the creditors' representative. (*Matter of Met-L-Wood Corp.* (7th Cir. 1988) 861 F.2d 1012, 1017.) While there may be an identity of interest between plaintiffs and the corporate investor and the uncertified federal class, the former did not attend and the latter did not come forward during the portion of the hearing dealing with the compromise.

In the federal cases concerning privity and virtual representation in the context of a prior bankruptcy proceeding, the party deemed to be a virtual

---

[20]Federal Rules of Bankruptcy Procedure, rule 9019(a) provides: "*On motion by the trustee* and after a hearing on notice to creditors [and others] as provided in Rule 2002 . . . , the court may approve a compromise or settlement." (Italics added.)

representative of the nonparty was the prime mover and a vigorous participant in the earlier proceeding. (See *In re Medomak Canning* (1st Cir. 1990) 922 F.2d 895; *Matter of Met-L-Wood Corp., supra,* 861 F.2d 1012.) Indeed, *adequate* representation in the earlier litigation by the party with parallel interests is the pivotal requirement for virtual representation. (18 Wright et al., Federal Practice and Procedure (1981) Jurisdiction and Related Matters, § 4457, pp. 494-502; *id.,* (1992 supp.) § 4457, at pp. 311-320 and cases cited therein.)

Here the settlement was between National Union and Technical Equities and none of the creditors (or the trustee) actually participated in negotiations or the hearing although by virtue of the notice they were afforded an opportunity to object.

National Union claims this lack of participation is irrelevant because these parties had the opportunity to object. However, it cites no authority for the extreme proposition that a nonparty can be bound by a judgment in an earlier proceeding of which he or she did not have notice and notwithstanding that there was virtually no advocacy, no control, and no actual participation in the litigation by the party with "identical" interests. For example, in *Medomak Canning,* where the reviewing court applied the virtual representation concept to junior lienholders on grounds of adequate representation by the trustee in bankruptcy, the trustee had spearheaded the previous compromise proceeding *plus* the lienholders had adequate notice of the hearing to approve the compromise.

In conclusion, for all the reasons aired above, we determine that the bankruptcy court order is not res judicata to the present adjudication of the issue of third year coverage.

## F. *The Cancellation Violated the Covenant*

■■■■ Liability carriers do not have an unfettered right to cancel coverage, notwithstanding mutual cancellation clauses to that effect. Cancellation provisions in an insurance contract are subject to the implied covenant of good faith and fair dealing just like any other clause. (*Spindle* v. *Travelers Ins. Companies* (1977) 66 Cal.App.3d 951, 958 [136 Cal.Rptr. 404].) This is a covenant " '. . . that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.' " (*Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 573 [108 Cal.Rptr. 480, 510 P.2d 1032].) The phrase "good faith" in the context of performance or enforcement of a contract " 'emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . . .' " (*Neal* v.

*Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 921-922, fn. 5 [148 Cal.Rptr. 389, 582 P.2d 980], quoting Rest.2d Contracts (Tent. Draft Nos. 1-7) § 231, com. a.) The precise duty embraced by the covenant depends on the nature of the bargain struck between the insurer and the insured and the legitimate expectations of the parties arising from the contract. (*Commercial Union Assurance Companies* v. *Safeway Stores, Inc.* (1980) 26 Cal.3d 912, 918 [164 Cal.Rptr. 709, 610 P.2d 1038].)

For our purposes the cancellation clause in *Spindle* was identical to the one at issue here. Plaintiff alleged the insurer cancelled for the purpose of making "an example" of him so as to discourage other insureds from resisting a 140 percent premium increase. He also alleged that insurance was not available at competitive rates from solvent, nonhazardous insurance carriers. The reviewing court found that this purported reason rendered cancellation a violation of the covenant. (*Commercial Union Assurance Companies, supra*, 26 Cal.3d at pp. 918-919.)

▮ Plaintiffs claim National Union's purported cancellation of third year coverage for the directors and officers breached the covenant of good faith and fair dealing. They contend its purpose was to avoid paying $10 million in coverage on third year claims—coverage which the insureds bargained for and could reasonably expect to remain intact. They recite the following facts: National Union had notice of potential claims, knew Technical Equities had filed under chapter 11, and knew that substantial claims had been made against its insureds. As early as February 12, 1986, interoffice memoranda referred to "The Problem" and "Big Problems."

In March 1986 Christopher Cavallaro, National Union's senior vice-president in charge of underwriting D&O insurance, made the decision to cancel Technical Equities' policy. He knew Technical Equities was in chapter 11 and had prepaid its premiums on the three-year policy. He was also aware that there were significant lawsuits pending against the directors and officers and more were expected to be filed. He based his decision to cancel on information related to him by Attorney Ken Sagat of D'Amato & Lynch which gave him a "gut feel[ing]" that some individuals at Technical Equities were "guilty of gross fraud." His understanding concerned three to five officers; he was not aware of any information indicating that the outside directors were engaged in gross fraud. Cavallaro's stated reason for cancelling was that he did not want to do business with people guilty of gross fraud. However, he also indicated that the policy did not afford coverage for dishonest acts established by adjudication. Nonetheless, he still felt a need to cancel the policy because they "weren't sure where the corporation was going" and "what was going to occur going forward."

Cavallaro did not know how Sagat came upon his information, nor did he attempt to verify its accuracy. He did not obtain input from anyone else within National Union's underwriting department, or elsewhere within or outside the company; he did not communicate with the insureds or their attorneys; he did not review any written material to apprise himself of the situation. In short, National Union did not undertake any investigation.

Cavallaro testified in court that he had no personal knowledge of fraud at Technical Equities until 1989 when he saw judgments in the coordinated action. His decision to cancel was informed only by allegations of fraud; he did not "think" anybody was guilty of anything, he "thought" there were some allegations. Cavallaro also expressed that fraud is alleged in "just about every D and O case . . . ." This was the only National Union cancellation he knew of where the premium had been prepaid and the company had filed for bankruptcy.

Cavallaro's reason for cancelling was not communicated to anyone involved in or affected by the cancellation, including National Union's own staff, Technical Equities, the insured directors and officers, and the insurance broker.[21] The senior underwriter for National Union indicated that in 1986 National Union did not have any policy guidelines concerning the basis for cancelling D&O policies. Technical Equities was the only cancellation he was aware of since joining National Union in 1983. It was also the only one that National Union's underwriting manager was aware of involving a corporation which had filed for bankruptcy.

Plaintiffs asserted below and reiterate here that National Union put its own interests ahead of its insureds, cancelling the policy to avoid paying up to an additional $10 million in third year claims, at the time when the directors and officers most needed the protection that had already been paid for.

The court found that "the attempted cancellation was arbitrary and without legal justification."[22] This finding is supported by the evidence reviewed above. The attempted cancellation was arbitrary because it was based on

---

[21]Under recent additions to the Insurance Code, commercial liability carriers are now required to state the reason for cancellation in the notice. (Ins. Code, § 677.2, added by Stats. 1986, ch. 1321, § 5, pp. 4669-4670.) Cancellation is not effective unless it is based on one of the enumerated statutory grounds. (Ins. Code, § 676.2, subd. (b).)

[22]Dubbing this a finding that National Union lacked good cause, National Union states it was entitled to cancel the policy without cause, citing *Jensen v. Traders & General Ins. Co.* (1959) 52 Cal.2d 786, 790 [345 P.2d 1] and *Beavers v. Allstate Ins. Co.* (1990) 225 Cal.App.3d 310, 318 [274 Cal.Rptr. 766]. While *Jensen* did determine that a standard cancellation clause giving five days' notice did not violate public policy, it did not concern the applicability of the good faith covenant to cancellation provisions nor did it review a factual determination of

mere allegations of fraud that were not tested by any verification.[23] Moreover, as Cavallaro, the decisionmaker, put it, nearly *all* D&O claims are accompanied by allegations of fraud. Yet this was the only cancellation he could remember involving a bankrupt, prepaid company. Further, the purported cancellation was across the board, sweeping aside numerous officers and directors which Cavallaro could not associate with allegations of gross misconduct. This, when loss reasonably foreseeable at the policy's inception, is imminent and unavoidable on the part of the prepaid insured at the time of cancellation. (See *Home Ins. Co. of New York* v. *Heck* (1872) 65 Ill. 111, 114, stating a similar concept in light of extreme facts, namely, insurer gives notice of cancellation when fire is approaching the insured property: "Of what avail would it be, to take a policy against fire, to permit its cancellation when the fire is approaching?") National Union's willingness to help Technical Equities, DIP, by issuing a new, one-year, $5 million policy in favor of DIP directors and officers does not alleviate its obligations to the insured former directors and officers of the prebankrupt entity. How can a policy which excludes wrongful prebankruptcy acts help them at all? The answer is that the new deal solely benefitted National Union and Technical Equities, DIP.

An arbitrary cancellation is a breach of the covenant of good faith and fair dealing. ▮▮▮ " '[W]here a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing.' " (*Spindle* v. *Travelers Ins. Companies, supra,* 66 Cal.App.3d at p. 958.) To exercise that power arbitrarily and to the detriment of the other party is inconsistent with that party's justified expectations.

## V. ATTORNEY FEES

The trial court awarded attorney fees to plaintiffs and cross-complainant Paul Kouns under authority of *Brandt* v. *Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796]. ▮▮▮ Our Supreme Court in *Brandt* held that when an insurer's tortious conduct reasonably compels the insured to retain counsel to obtain benefits due under the policy, the insurer is liable in a tort action for that expense. (At p. 817.) Why? Because they are damages resulting from a tort. And, since they are recoverable as damages,

---

breach. *Beavers* relies exclusively on *Jensen,* and although there was an evidentiary issue concerning the covenant, that portion of the opinion was not published.

[23]We note that under the new statutory restrictions on cancellation, an allowable reason to cancel is "[d]*iscovery of* willful or grossly negligent acts or omissions . . . by the named insured . . . which materially increase any of the risks insured against." (Ins. Code, § 676.2, subd. (b)(4).) We emphasize the phrase "discovery of" because it connotes what did not happen here, namely, that awareness of the act or omission was the result of a search or inquiry.

determination of recoverable fees must be made by the trier of fact unless the parties stipulate otherwise. (*Id.*, at p. 819.)

Plaintiffs moved for their fees *after* judgment in the McLaughlin case wherein National Union was found to have breached the covenant of good faith and fair dealing for denying all but $10 million in coverage under the D&O policy. Kouns's award was conditioned on later determination that National Union wrongfully denied him coverage.

These awards must be reversed in light of our partial reversal. Plaintiffs and counterclaimant Paul Kouns may seek reevaluation of the propriety of such awards after the judgment in McLaughlin becomes final.

## VI. DISPOSITION

The judgment is reversed insofar as it declares that defense costs are payable under the policy in addition to the limits of liability and insofar as it declares there is $10 million in coverage for first year claims. The judgment is affirmed insofar as it declares there is $10 million in coverage for third year claims. The judgment awarding attorney fees to plaintiffs and cross-complainant is reversed, with the trial court retaining jurisdiction over the cause for possible reevaluation consistent herewith.

Perley, J., and Reardon, J., concurred.

A petition for a rehearing was denied November 30, 1992, and appellant's petition for review by the Supreme Court was denied February 11, 1993. Panelli, J., was of the opinion that the petition should be granted.