## CHECKRITE LIMITED, INC. and Checkrite California Inc., Plaintiffs,

v.

## ILLINOIS NATIONAL INSURANCE COMPANY, Defendant.

### No. 99 Civ. 1435(RWS).

United States District Court, S.D. New York.

May 4, 2000.

---

Camhy Karlinsky & Stein LLP, New York City, Ronald D. Lefton, Christine Carabba, of counsel, for Plaintiffs.

Steinberg & Cavaliere, White Plains, NY, Kevin F. Cavaliere, of counsel, for Defendant.

## OPINION

SWEET, District Judge.

Plaintiffs CheckRite Ltd. Inc. and CheckRite California Inc. (collectively, "CheckRite") have moved pursuant to Federal Rule of Civil Procedure 56(c) for summary judgment declaring that defendant Illinois National Insurance Company ("Illinois National") is liable to indemnify CheckRite for its costs for defenses and settlement of certain class action claims. Illinois National has cross-moved for summary judgment dismissing the complaint, and for an award of its attorneys' fees and disbursements in this action. For the reasons set forth below, the motion for summary judgment by CheckRite will be denied, and the motion for summary judgment by Illinois National to dismiss the complaint will be granted, and its motion for fees and disbursements denied.[1]

### The Parties

CheckRite Ltd. Inc. is a corporation organized and existing under the laws of Colorado and has an office located in Midvale, Utah.

CheckRite California Inc. ("CheckRite Ca.") is a corporation organized and existing under the laws of California and has offices in California and Midvale, Utah.

Illinois National Insurance Company is a corporation organized and existing under the laws of Illinois with its executive offices in New York, New York.

### Prior Proceedings

CheckRite filed the complaint in this action on February 25, 1999, seeking a declaratory judgment pursuant to 28

---

1. Illinois National also moved to amend its answer to allege additional affirmative defenses. CheckRite opposed this motion. Because summary judgment is granted to Illinois Na- tional based on defenses asserted in its initial answer, the motion to amend the answer is now moot.

U.S.C. §§ 2201 and 2202 that Illinois National is liable to indemnify CheckRite for its costs or defenses and settlement of class action claims based upon alleged violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA") from January 27, 1994 through December 31, 1996; damages for its costs of defense and settlement of those claims, in excess of amounts paid by another insurer, and for all counsel fees relating to said litigation; damages for breach of the covenant of good faith and fair dealing; and punitive damages. The parties subsequently engaged in document discovery. The instant motions were heard and marked fully submitted on January 26, 2000.

## Facts

The facts set forth below are gleaned from the parties' Rule 56.1 statements, affidavits, and exhibits and are undisputed except where otherwise noted.

CheckRite Ltd. and CheckRite Ca. were in the business of collecting bad checks issued by consumers as defined in the FDCPA. CheckRite Ca. did not itself conduct debt collection activity except through CheckRite Ltd.

CheckRite at all relevant times was a member of the American Collectors Association ("ACA") and purchased insurance policies through programs sponsored by that Association.

On or about September 28, 1993, a class action styled *Debbie Newman et al. v. CheckRite Cal. Inc. et al,* Civ. S–93–1557 LKK/PAN, was commenced against CheckRite Ca. in the United States District Court for the Eastern District of California. This action sought to recover damages for alleged violations of, *inter alia,* the FDCPA. The judge presiding over the action certified a class defined as:

> persons who have written checks in California which have been dishonored and subsequently assigned to defendants and from whom defendants have demanded unlawful charges or to whom defendants made false representations within one year preceding the filing of this complaint.

The class thus included persons injured between September 29, 1992 and September 28, 1993. CheckRite Ca. gave notice to its then insurance carrier, Employers Insurance of Wassau ("Employers Insurance"). That carrier contributed 100% of the applicable coverage, in the amount of $1 million, to the defense and indemnification of CheckRite Ca. in this action.

Subsequently, in January 1994, the named plaintiffs in the original action filed an amended class action complaint. This complaint sought certification of a class defined in precisely the same terms as the original class, except that it pertained to consumers who had been injured within one year of the filing of the amended complaint, *i.e.,* between January 27, 1993 and January 27, 1994. Ultimately, the judge overseeing this litigation certified a class that included California consumers injured between September 29, 1992 (one year before the filing of the original complaint) and January 27, 1994 (the filing of the amended complaint). The litigation concerning the claims of this class will be referred to herein as the "Newman Class Action".

CheckRite Ltd. was also added as a defendant at the time of the 1994 amended complaint. CheckRite Ltd. gave notice to its then carrier, Employers Insurance, which provided 100% coverage, including the cost of defense and indemnification, under a separate policy, for the full amount available under the policy of $1 million. This was in addition to the coverage previously made available to CheckRite Ca.

In late 1995, CheckRite purchased errors and omissions liability insurance coverage underwritten by Illinois National for the policy year November 1, 1995 through

November 1, 1996 (the "1995–96 Policy").[2] The 1995–96 Policy includes a $5,000,000 limit of liability, per claim and in the aggregate.

CheckRite continued to obtain coverage from Illinois National, pursuant to a renewal application, for the policy year November 1, 1996 through November 1, 1997 (the "1996–97 Policy"). The 1996–97 Policy also includes a $5,000,000 limit of liability, per claim and in the aggregate.

The Illinois National policy was a "claims made" policy. This meant that it provided coverage for losses arising from claims made by third parties against CheckRite. The terms of the policy that are relevant to this dispute are as follows:

The "Coverage Agreement" states that: The Company will pay on behalf of the Insured Damages which the Insured shall become legally obligated to pay for any Claim or Claims first made against the Insured and reported to the Company during the Policy Period for Wrongful Acts of the Insured or another for whom the Insured is legally responsible committed solely in the conduct of the Insured's Professional services.

Section I.A., 1995–96 Policy.[3]

A "claim" is defined in the 1995–96 Policy as:

1. any judicial, administrative or arbitration proceeding initiated against one or more Insured(s) in which such Insured(s) may be subjected to a binding adjudication of liability for Damages; or

2. any written notice from a Client, Customer or "Consumer" that it is the intention of such Client, Customer or Consumer to hold one or more Insured(s) responsible for liability arising out of professional services provided by the insured or any person for whom the insured is legally responsible.

Section VII.F., 1995–96 Policy.

The 1996–97 Policy defines a "claim" in nearly identical terms, except that the definition provided in subsection 2 is:

2. Any written demand from a "Client or Customer" or "Consumer" for money.

Section VII.F., 1996–97 Policy.

A claim is considered "first made" upon the earlier of the following two occurrences:

1. when a written Claim is first mailed to or filed against the Insured, or

2. when written notice is first mailed to the Company by or on behalf of the Insured of specific circumstances involving a particular person or organization which may result in a Claim. . . .

Section III.B., 1995–96 Policy.

The 1995–96 Policy defines the "Policy Period" as:

[T]he period commencing on the inception date and ending on the expiration date stated in Item 2 of the Declarations unless sooner terminated as herein provided.

Section VIII.A., 1995–96 Policy.

The 1996–97 Policy defines the "Policy Period" as:

[T]he period commencing on the effective date and ending on the expiration date stated in item 2 of the Declarations

---

2. Illinois National issued identical policies in favor of CheckRite Ltd. and CheckRite Ca. for each of the 1995–96 and 1996–97 policy years, pursuant to a requirement of the ACA, although CheckRite Ca. did not itself conduct debt collection activity except through CheckRite Ltd.

3. The relevant terms of the 1995–96 Policy and 1996–97 Policy are for the most part identical. Therefore, the excerpted terms are taken from the 1995–96 Policy except where there is a difference between the two policies. In that case, the difference will be noted.

unless sooner terminated as herein provided.

Section VII.S., 1996–97 Policy.

Although there is no page entitled "Declarations" accompanying the 1995–96 Policy, there is a page entitled "Notice of Insurance" which specifies that the "policy period" is "from 11/01/95 to 11/01/96". There is a "Declarations" page accompanying the 1996–97 Policy and item 2 on this page states that the "policy period" is "from 11/01/96 to 11/01/97".

Both policies include a provision for retroactive coverage to November 1, 1988, provided that:

the insured had no knowledge as of the inception date of this policy of any Claim or any circumstances, act, alleged error, omission or offense which might be expected to result in a claim; and

the Insured does not have any other valid and collectible insurance that would apply with respect to a Claim for Damages brought against the Insured under this coverage.

Section III.A.2., 1995–96 Policy.

An "Extended Reporting Period Option" clause permits the insured to obtain additional time within which to report claims in exchange for additional premium payments in the event that the policy is cancelled or not renewed:

If coverage under this policy is cancelled or nonrenewed by an Insured or the Company ... the Insured may request to have an endorsement issued providing for an extended reporting period not to exceed twenty four (24) months following the effective date or termination or expiration of this policy.... The premium shall be 100% of the expiring annual premium for a twelve (12) months extended reporting period coverage and 175% of the expiring annual premium for a twenty four (24) month extended reporting period coverage....

If an Extended Reporting Period Endorsement is issued, a claim for Damages first made during the extended reporting period will be deemed to have been made on the last day of the policy period, provided that such Claim arises out of a Wrongful Act in the performance of Professional Services performed by the Insured or any person for whom the Insured is legally responsible between the inception date or retroactive date, if any, and the termination or expiration date of the policy....

Section VI., 1995–96 Policy.

There is a provision providing that the policy will be renewed absent notice from the Company:

Nonrenewal of this policy shall not occur unless the Company has sent by mail to the Named Insured ... at least 90 days advance notice of its intention not to renew. If the notice is not given at least 90 days before the date of expiration provided in the policy, the policy shall continue in force until 90 days after the notice of intent not to renew is received by the Named Insured.

This section does not apply if the Named Insured or Collection Office, Credit Bureau, or Check Verification/Recovery Office, has insured elsewhere, has accepted replacement coverage, or has requested or agreed to nonrenewal.

Section VIII.J.5., 1995–96 Policy.

Finally, each of the Policies contains an exclusion for "pending or prior litigation."

The 1995–96 Policy states that:

This policy does not apply to Claims:

arising out of any pending or prior litigation as of the inception date or Retroactive date, if any, of the Policy Period, or arising out of the same or essentially the same Wrongful Acts alleged in such pending or prior litigation.

Section II.S., 1995–96 Policy.

The 1996–97 Policy states that:

This policy does not apply to:

Any pending or prior litigation as of the effective date, or retroactive date, if any, of the "Policy Period", or arising out of the same or essentially the same

"Wrongful Acts" alleged in such pending or prior litigation.

Section II.P., 1996–97 Policy.

On May 8, 1996, the Newman Class Action plaintiffs filed a second amended class action complaint (the "Second Amended Complaint") seeking money damages from, among others, CheckRite, for persons injured by FDCPA-violative conduct since January 27, 1994 (the date of the filing of the first amended complaint). Pursuant to a class certification order of August 1996 and a subsequent amendment thereof, the judge presiding over that action certified a class defined as those California consumers:

> on whose claims the statute of limitations has not run, who were sent or will be sent during the pendency of this action, a notice from one or more defendants containing identical or similar demands or representations to those contained in a notice sent to any named plaintiff.

This class was ultimately defined as including those persons injured between January 27, 1994 and December 31, 1996. The judge imposed the December 31, 1996 cut-off date because of a change in the substantive law effective January 1, 1997 that allowed those fees which had previously been illegal.

In a letter dated February 20, 1997, CheckRite submitted a claim letter to Illinois National through its agent A.I. Management and Professional Liability Claim Adjustors ("AIG"). The letter stated in relevant part that it was "Re: Newman v. CheckRite—claim form enclosed," that "the Summons and Complaint in this matter was originally served on 10/8/93," and that "[b]ecause the judge has certified a class that may include claims through 1997, we are tendering a claim under the following policies [referring to the policy numbers for CheckRite's two offices]." CheckRite enclosed a copy of the original 1993 complaint in *Newman v. CheckRite* and the August 1996 class certification order.

In a letter dated March 19, 1997, Illinois National disclaimed coverage as to the February 20, 1997 claim. The letter stated that:

> A review of the documents provided indicates that prior to the inception of your policy with Illinois National, which began on November 1, 1995, a class action suit was brought against your company.... It is our understanding that the judge in this case may permit claims through 1997 in this suit.

The letter cited the "pending or prior litigation" exclusion clause and the "policy period" definition in the 1996–97 Policy as bases for the disclaimer, and stated:

> The claim which you submitted arises out of litigation which commenced on October 8, 1993. The ... policy does not apply to those claims which stem from litigation which predates the policy period. As your current policy ... is effective November 1, 1996 through November 1, 1997, it will not apply to a claim arising out of litigation which began in 1993.

The next time CheckRite communicated with Illinois National regarding this matter was in a letter dated June 9, 1998. In that letter, CheckRite through its counsel demanded coverage pursuant to the 1995–96 and 1996–97 Policies for the claims by individual class members in the Newman action "which post date the filing of the action in September 1993". CheckRite further asserted that the "pending or prior litigation" exclusion in Section II.P of the 1996–97 Policy did not bar coverage, and set forth arguments as to why it believed that to be the case. Illinois National made no written response but orally reiterated its March 1997 disclaimer.

By letter dated June 27, 1998, CheckRite notified Illinois National of the proposed settlement of the litigation arising out of the Second Amended Complaint and again demanded coverage. Illinois National did not respond.

Ultimately, a settlement was entered into according to which total payments to the class certified pursuant to the Second Amended Complaint, to counsel for the class, and for administration costs are capped at $4.3 million. CheckRite's prior insurance carrier contributed approximately $1,150,000 towards this amount. Check-Rite states that it is liable for up to $3.2 million plus fees and expenses to its counsel of more than $425,000.

## Discussion

### I. Coverage Under The Illinois National Policies

#### A. Choice of Law

■■■ Subject matter jurisdiction in this case is based upon diversity of citizenship of the parties. *See* 28 U.S.C. § 1332. Thus, this court must determine which substantive state law governs. The Illinois National insurance policy does not contain a choice-of-law provision, nor do the parties address the choice of law question in their legal memoranda. However, the parties cite primarily to New York law, thereby implicitly agreeing that this is the applicable law. *See Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 203 n. 7 (2d Cir.1998); *Cowan v. Codelia*, No. 98 Civ. 5548, 1999 WL 1029729, at *4 n. 2 (S.D.N.Y. Nov. 10, 1999). "Implied consent to use a forum's law is sufficient to establish choice of law." *Tehran–Berkeley Civil and Envtl. Eng'rs v. Tippetts–Abbett–McCarthy–Stratton*, 888 F.2d 239, 242 (2d Cir.1989); *see also Hannex Corp.*, 140 F.3d at 203 n. 7; *Cowan*, 1999 WL 1029729, at *4 n. 2.[4] Thus, the Court will apply New York substantive law to this case.

#### B. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)); *see Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 (2d Cir.1995); *Burrell v. City Univ.*, 894 F.Supp. 750, 757 (S.D.N.Y.1995). If, when viewing the evidence produced in the light most favorable to the nonmovant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Burrell*, 894 F.Supp. at 758 (*citing Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991)).

Materiality is defined by the governing substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of factual issues— where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985).

■■■ Under New York law, the court determines the proper construction of an insurance contract, as with other contracts, as a matter of law. *See Andy Warhol Foundation for the Visual Arts, Inc. v.*

---

**4.** Illinois National does dispute the applicability to its policies of a New York insurance regulation cited by CheckRite. *See* n. 10, *infra*. This point of contention, however, does not alter the choice of law analysis given that Illinois National, like CheckRite, cites overwhelmingly to New York law. Nor is the issue of the regulation's applicability significant for the analysis herein.

*Fed. Ins. Co.,* 189 F.3d 208, 215 (2d Cir. 1999) (*citing Dicola v. American S.S. Owners Mut. Protection & Indem. Ass'n, Inc.,* 158 F.3d 65, 77 (2d Cir.1998)). The first analytic step for the court is to make an initial interpretation of the policy that will "give effect to the intent of the parties as expressed in the clear language of the contract." *Village of Sylvan Beach v. Travelers Indem. Co.,* 55 F.3d 114, 115 (2d Cir.1995) (citations omitted). In making this initial interpretation, the court must determine whether the policy terms are ambiguous. A contract provision is unambiguous where it has " 'a definite and precise meaning, unattended by danger of misconception in the purpose of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.' " *Sayers v. Rochester Telephone Corp.,* 7 F.3d 1091, 1095 (2d Cir.1993) (citations omitted). A contract is not ambiguous merely because the parties argue for different interpretations, nor "where the interpretation urged by one party 'strain[s] the contract language beyond its reasonable and ordinary meaning.' " *See Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989) (citation omitted).

 If the terms of the policy are susceptible to more than one reasonable interpretation, then the court should consider extrinsic evidence to determine the parties' intent. *See Warhol,* 189 F.3d at 215. If the extrinsic evidence is inconclusive, the court should apply the interpretative rule that ambiguities in an insurance contract are ordinarily construed in favor of coverage and against the insurer. *See id.; Dicola,* 158 F.3d at 77; *Lavanant v. General Accident Ins. Co.,* 79 N.Y.2d 623, 584 N.Y.S.2d 744, 595 N.E.2d 819, 822 (1992). This rule is based on the fact that it is the insurance company that drafted the policy, and therefore the insurance company that is responsible for any ambiguities therein. *See Warhol,* 189 F.3d at

215; *Lavanant,* 584 N.Y.S.2d 744, 595 N.E.2d at 822. If the ambiguities can be resolved through a legal construction of the policy terms, rather than a factual one, summary judgment may be appropriate even where the policy is ambiguous. *See Warhol,* 189 F.3d at 215 (citations omitted).

 Finally, with respect to coverage exclusions, an insurer bears the burden of proving that an insurance policy's exclusions "clearly and unmistakably" apply to the insured's claims. *Sylvan Beach,* 55 F.3d at 115–16. The court should construe exclusion provisions narrowly and in favor of coverage. *See Home Ins. Co. of Illinois v. Spectrum Information Technologies, Inc.,* 930 F.Supp. 825, 848 (E.D.N.Y. 1996); *Cone v. Nationwide Mut. Fire Ins. Co.,* 75 N.Y.2d 747, 551 N.Y.S.2d 891, 551 N.E.2d 92, 93 (1989).

### C. *CheckRite Is Not Entitled To Coverage Under The 1995–96 Policy*

The first issue confronting CheckRite with respect to coverage under the 1995–96 Policy is the question of whether the Second Amended Complaint was a new claim at all, such that it could be considered "made" during the policy period. As explained below, however, the Second Amended Complaint was indeed a new claim. The problem, however, and the dispositive issue, is CheckRite's failure to comply with the policy's reporting requirements.[5]

 It is noted that CheckRite contends that Illinois National has waived all defenses other than the one asserted in its March 19, 1997 letter, *i.e.,* the "pending or prior litigation" exclusion under the 1996–97 Policy. This contention, however, is incorrect. Although a defense to coverage may be waived, waiver cannot create coverage where none exists under the policy. *See Albert J. Schiff Assocs., Inc. v. Flack,* 51 N.Y.2d 692, 435 N.Y.S.2d 972, 417

---

5. Illinois National advances a number of other arguments which need not be addressed because the reporting issue resolves the liability question in Illinois National's favor.

N.E.2d 84, 87 (1980). Thus, "where the issue is the existence or nonexistence of coverage (*e.g.,* the insuring clause and exclusions), the doctrine of waiver is simply inapplicable." *See id.; see also Calocerinos & Spina Consulting Eng'rs, P.C. v. Prudential Reinsurance Co.,* 856 F.Supp. 775, 780 (W.D.N.Y.1994); *cf. Luria Bros. & Co. v. Alliance Assurance Co.,* 780 F.2d 1082, 1090–91 (2d Cir.1986) (insurer waived misrepresentation defense where asserted different defense only despite constructive notice of misrepresentation). The requirement that claims be reported within a specified time period is "the trigger for coverage" under a claims-made policy, not a defense to existing coverage, and cannot be waived. *Calocerinos,* 856 F.Supp. at 780.

### 1. *The Second Amended Complaint Was A Claim Made During the 1995–96 Policy*

█ Illinois National maintains that the Second Amended Complaint, although it was filed in May 1996, was not a "claim made" during the 1995–96 Policy period because it was part of the same "judicial proceeding," *i.e.,* the Newman Class Action. Instead, argues Illinois National, this was one and the same claim as the Newman Class Action. It is undisputed that the Newman Class Action (which included persons injured between September 29, 1993 and January 27, 1994) was not covered by the 1995–96 Policy, since it was predated November 1, 1995. Illinois National's argument turns on the procedural posture of the Second Amended Complaint, that is, it was part of the same judicial proceeding because the mechanism by which the claims of the new class were raised was through an amended complaint. Illinois National's reliance on the procedural posture of the Second Amended Complaint, however, is misplaced.

The 1995–96 Policy provides two definitions of a "claim". The first definition is a "judicial, administrative, or arbitration proceeding" in which the insured may be liable for damages. The other definition is a "written notice" from a third party that it is their intent to hold the insured liable.

The term "claim" as used in liability insurance policies has generally been found by courts to be an unambiguous term that means a demand by a third party against the insured for money damages or other relief owed. *See, e.g., American Ins. Co. v. Fairchild Indus., Inc.,* 56 F.3d 435, 439 (2d Cir.1995) (interpreting term "claim" under New York law); *Spectrum,* 930 F.Supp. at 845 (citations omitted); *In re Ambassador Group,* 830 F.Supp. 147, 155 (E.D.N.Y.1993); *Heen & Flint Assocs. v. Travelers Indem. Co.,* 93 Misc.2d 1, 400 N.Y.S.2d 994, 996 (N.Y.Sup. Ct.1977).

The Newman Class Action and the Second Amended Complaint, respectively, involved distinct classes of people who sought to hold CheckRite liable for damages resulting from unlawful conduct during distinct periods of time. The Newman Class Action concerned persons who sought to hold CheckRite liable for FDCPA-violative conduct occurring between September 29, 1992 and January 27, 1994. The Second Amended Complaint concerned persons who sought to hold CheckRite liable for FDCPA-violative conduct occurring between January 27, 1994 and December 31, 1996.

Prior to the filing of the Second Amended Complaint, no one had made a demand against CheckRite for money damages for FDCPA-violative conduct between January 27, 1994 and December 31, 1996. There was no judicial proceeding against CheckRite in which it could have been subjected to damages to these persons. Nor could any such person have shared in a recovery pursuant to the Newman Class Action. The Second Amended Complaint concerned a new and distinct group of claimants.

The decision in *Spectrum* is instructive on this issue. *See* 930 F.Supp. 825. In that case, several different class action

suits filed against an insured party had been consolidated into a single action. *See id.* at 829, 831–33. The insured's coverage was pursuant to a claims made liability policy. *See id.* at 845. The earliest of the suits was filed before the inception of the insured party's claims-made coverage, and it was undisputed that this suit was not covered by the policy. *See id.* The insured sought indemnification, however, for those class action suits that were filed during the policy period. *See id.* The insurer argued that due to the consolidation there was only one "suit" and, therefore, only one "claim"—a claim which was made when the earliest suit was filed, *i.e.,* before the policy period. *See id.* at 846–47. The policy in *Spectrum* defined a "claim" in similar terms as the instant policy, as "a written demand by a third party for monetary damages, including the institution of suit or a demand for arbitration". *See id.* at 846.

The *Spectrum* court rejected the insurer's attempt to conflate the terms "suit" and "claim", observing that under the plain language of the contract these were distinct concepts, so that:

> [T]here may be a 'claim' without the institution of a 'suit' (e.g., by demanding arbitration without or before fling a suit), or a "suit" that does not necessarily constitute a "claim," (e.g., by filing a suit after arbitration has been demanded). Thus, because the concepts are distinct, a "suit" may contain several discrete "claims," as in this case.

930 F.Supp. at 846–47.

Here, Illinois National attempts to equate the term "judicial proceeding" with the term "claim". Under the plain language of the policy, however, some but not all claims are judicial proceedings and some but not all judicial proceedings are claims. These terms should not be conflated. As a matter of class action procedure, it is true the Second Amended Complaint served to join the demands of a new group of plaintiffs for a separate set of injuries to the demands of the Newman Class Action plaintiffs. The gravamen of the issue lies elsewhere, however, because "the concept of 'claim' within the meaning of insurance policies is textual rather than procedural." *Spectrum,* 930 F.Supp. at 847. This point is further illustrated if one imagines that the Second Amended Complaint had been brought as a procedurally distinct class action suit, as the actions were in *Spectrum.* It would be an unreasonable construction of the policy to view the Second Amended Complaint as something other than a new claim on behalf of a new group of litigants.

The problem with respect to coverage under the 1995–96 Policy, however, is that it required that claims be made and reported within the same policy period. As explained below, this requirement is fatal to CheckRite's claim.

### 2. *The Second Amended Complaint Was Not Reported Within The 1995–96 Policy Period*

The nature of a claims-made policy is that it protects the insured for claims made against it and reported to the insurer within the policy period or, if applicable, the extended reporting period. *See generally* Lee R. Russ, *Couch on Insurance* §§ 102:20, 102:24 (3d ed.1999); *see also Camalloy Wire, Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa.,* 264 A.D.2d 667, 695 N.Y.S.2d 562, 562 (N.Y.App.Div.1999). Thus, "[a]n insured under a 'claims made' policy knows in advance that there is an applicable date that cuts off claims". *Rochwarger v. Nat'l Union of Fire Ins. Co. of Pittsburgh, Pa.,* 192 A.D.2d 305, 595 N.Y.S.2d 459, 459 (N.Y.App.Div.1993). This is in contrast to an "occurrence" policy, which protects the insured from liability for acts committed during the policy period regardless of when claims arise based on those acts. *See Calocerinos,* 856 F.Supp. at 777–78.

The existence of a cut-off date is integral to a claims-made policy, as it is "a distinct characteristic of such a policy that directly

relates to rate setting". *Rochwarger,* 595 N.Y.S.2d at 459. The insurer is afforded greater certainty in computing premiums, since it does not need to be concerned with the risk of claims filed long after the policy period has ended, and as a result the insured may benefit from lower premiums. *See Calocerinos,* 856 F.Supp. at 777–778; *see also Helfand v. National Union Fire Ins. Co. of Pittsburgh, Pa.,* 10 Cal.App.4th 869, 888, 13 Cal.Rptr.2d 295 (1992).

■ The authorities establish that there is no coverage under a claims-made policy where the insured fails to notify the insurer of a claim by the end of the policy period (or extended reporting period, if any). *See Warhol,* 189 F.3d at 215 ("late notice of a claim vitiates coverage"); *Nat'l Union Fire Ins. Co. v. Talcott,* 931 F.2d 166, 168 (1st Cir.1991) (reporting of claim outside of policy period is "fatal to the claim"); *Calocerinos,* 856 F.Supp. at 779–80; *Gomez v. Feder, Connick & Goldstein, P.C.,* 260 A.D.2d 348, 687 N.Y.S.2d 679, 679 (N.Y.App.Div.1999); *Rochwarger,* 595 N.Y.S.2d at 459.

CheckRite's first communication with Illinois National regarding the Second Amended Complaint was in its letter dated February 20, 1997.[6] It is undisputed that this is the earliest date at which it could be deemed to have reported this claim. The 1995–96 Policy Period had concluded over three months earlier, on November 1, 1996. CheckRite continued to have liability coverage with Illinois National but that coverage was pursuant to the 1996–97 Policy.

CheckRite acknowledges that it did not report this claim until the 1996–97 Policy year but argues that it nonetheless complied with its reporting obligations because its coverage under the 1996–97 Policy was pursuant to an automatic renewal of the 1995–96 Policy.[7] The effect of the renewal, according to CheckRite, was to provide it with "seamless and continuous coverage" from November 1, 1995 through November 1, 1997. The reporting period supposedly extended through the renewal period, so that a claim made during the 1995–96 Policy could be reported during the 1996–97 Policy.

CheckRite further contends that the "Extended Reporting Period" provision supports its argument. This provision gives the insured the option of purchasing an extended reporting period of up to 24 months if the policy is cancelled or nonrenewed. According to CheckRite, the fact that it is only possible to purchase an extended reporting period if the policy is cancelled or nonrenewed means that there is no need to purchase an extended reporting period if the policy *is* renewed, and that an extended reporting period is "inherent in the renewal".

CheckRite's argument strains the language of the policy and does not render ambiguous the policy's otherwise unambiguous terms. *See Colson Servs. Corp. v. Ins. Co. of N. Am.,* 874 F.Supp. 65, 68 (S.D.N.Y.1994) ("[A]n ambiguity is not created simply because the parties to an insurance contract put forward different interpretations of its terms, particularly 'where one of two competing constructions

---

6. Illinois National has argued that the February 20, 1997 letter was substantively inadequate to constitute communication of the Second Amended Complaint, as neither the letter nor the enclosed August 1996 class certification order references the complaint itself. These arguments need not be addressed, however, because CheckRite's failure to report the claim during the 1995–96 Policy is determinative of its coverage under that policy. Therefore, it will be presumed for purposes of this discussion that the February 20, 1997 letter was sufficient as to its contents to put Nation-

al Illinois on notice of the claim represented by the Second Amended Complaint.

7. Illinois National argued for the first time in its Reply Memorandum of Law that the 1996–97 Policy was not in fact a renewal of the 1995–96 Policy. This argument finds little support in the terms of contract, including the "Nonrenewal" clause, or other aspects of the record. In any event, because CheckRite's claim under the 1995–96 Policy fails even if the 1996–97 Policy was a renewal, the argument is immaterial to the outcome.

is strained or unnatural.' ") (*quoting County of Schenectady v. Travelers Ins. Co.*, 48 A.D.2d 299, 368 N.Y.S.2d 894, 897 (1975)). According to the plain language of the policy, National Illinois is obligated only for those claims that are "first made against the Insured and reported to the Company during the Policy Period". The critical term, "policy period," is defined as "the period commencing on the inception date and ending on the expiration date stated in Item 2 of the Declarations unless sooner terminated as herein provided." The policy period for the 1995–96 Policy is clearly stated in the "Notice of Insurance" as being "11/01/95 through 11/01/96".[8] Nowhere in the contract does it say that renewal creates a continuous period of coverage during which the insured may report claims without regard to the policy period in which they were first made.

Further, the "Extended Reporting Period" clause does not support a reading into the contract of an "inherent" extended reporting period in event of renewal. First, this clause simply does not speak to what happens when a policy is renewed. Instead, it speaks solely and explicitly to what happens when a policy is not renewed or cancelled. Thus, it is inapplicable to the situation here. Second, there is nothing in either the Extended Reporting Period clause or in any other provision of the policy that states either explicitly or implicitly that the insured is entitled to some form of extended reporting period under all possible scenarios—cancellation, nonrenewal, or renewal. On the contrary, the Extended Reporting Period clause sets out specific circumstances and terms for when an insured may obtain additional reporting time, *i.e.*, where there is nonrenewal or cancellation, and only in exchange

for additional premium dollars. Thus, rather than supporting CheckRite's argument, this clause is consistent with the general rule that extended reporting time must be bargained for specifically and is not "inherent" to anything.

CheckRite also argues that is illogical to allow an insured to purchase an extended reporting period if it cancels or fails to renew its policy but not if it renews. As another court has noted, "[a]t first blush, th[e] argument has some intuitive appeal," since it may seem odd that the insured who renews receives less protection than one who cancels or does not renew. *See Ehrgood v. Coregis Insurance Co.*, 59 F.Supp.2d 438, 446 (M.D.Pa.1998) (rejecting insured's argument that renewal operated as extended reporting period for claims-made policy). In fact, however, there is a rationale for providing this option only in the case of cancellation or nonrenewal. An insured who cancels or does not renew faces a risk of coverage gaps that can result from switching to an occurrence policy or to another claims-made policy. *See Ehrgood*, 59 F.Supp.2d at 447. A gap can occur where an insured switches to an occurrence policy because there will be no coverage for claims based on acts that happened during the claims-made policy but before the occurrence policy. *See Ehrgood*, 59 F.Supp.2d at 447. A gap can occur where the insured switches to another claims-made policy because the subsequent carrier might impose a retroactive date that limits coverage for prior acts. *See id.* An extended reporting period option gives the insured the ability to protect itself in these situations. Where the insured simply renews its policy, however, it does not face the same problems of coverage gap.[9]

8. As noted earlier, the 1995–96 Policy is not accompanied by a "Declarations" page, but it does have a "Notice of Insurance" page which contains much of the same information, including the policy period.

9. CheckRite hypothesizes a scenario in which an insured receives a claim on the last day of its policy, which policy is then renewed effective the following day, but the insured does not report the claim until a few days into the renewal policy. Whether or not it would be "absurd" to deny coverage under those circumstances, as CheckRite contends, the case before this court does not involve an eleventh-hour claim. CheckRite waited over three months after the end of the 1995–96 Policy

It must be remembered that the reporting period defines coverage under a claims-made policy. To read an "inherent" extended reporting period into a renewal policy would "creat[ ] a long [and unbargained-for] 'tail' of liability exposure, the avoidance of which forms the conceptual framework for claims made coverage in the first instance." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Bauman*, No. 90 C 0340, 1992 WL 1738, at *10 (N.D.Ill. Jan. 2, 1992). This conceptual framework applies where a policy is renewed, as well as when it is not, since each policy year represents an agreement as to a specific period during which claims made and reported will be covered.

Although no New York cases have been cited on this issue, most courts that have confronted it have concluded that a renewal does not extend the reporting period for claims made during the earlier policy period. *See Talcott*, 931 F.2d at 166–68; *Ehrgood*, 59 F.Supp.2d at 446–47; *Bauman*, 1992 WL 1738, at *10–11; *Insite-Properties, Inc. v. Jay Phillips, Inc.*, 271 N.J.Super. 380, 638 A.2d 909, 912–13 (App. Div.1994); *Helfand*, 10 Cal.App.4th at 885–87, 13 Cal.Rptr.2d 295. It has been concluded that such a rule is consistent with the rationale underlying claims made insurance and the reasonable expectations of the parties to such policies. *See, e.g., Talcott*, 931 F.2d at 169; *Ehrgood*, 59 F.Supp.2d at 447. CheckRite cites only one case to the contrary, from the appel-

late court of Ohio, and even that case is distinguishable based on the language of the policy before that court. *See Helberg v. Nat'l Union Fire Ins. Co.*, 102 Ohio App.3d 679, 657 N.E.2d 832 (1995).[10]

Therefore, for the reasons set forth above, CheckRite as a matter of law is not entitled to coverage under the 1995–96 Policy.

### D. *CheckRite Is Not Entitled To Coverage Under The 1996–97 Policy*

The 1996–97 Policy, like the 1995–96 Policy, required that claims be made and reported within the same policy period. Thus, as the discussion above should make clear, the problem for CheckRite's claim to coverage under the 1996–97 Policy is exactly the obverse of what it was under the 1995–96 Policy. The Second Amended Complaint was reported by letter of February 20, 1997, *i.e.*, during the 1996–97 Policy. But it was filed, and therefore "made," during the 1995–96 Policy. There was no continuous coverage and reporting period spanning the two policy period, and no coverage under the 1996–97 Policy in these circumstances.

CheckRite contends that it is entitled to coverage under the 1996–97 Policy on the grounds that the Second Amended Complaint did not constitute a single claim but, instead, that each class member must be considered to have a made separate claim for purposes of the claims-made policy.[11]

Period to send its letter of February 20, 1997, not to mention seven months after the class certification order and ten months after the filing of the Second Amended Complaint itself.

Along the same lines, CheckRite's reference to a New York insurance regulation which requires insurers to provide an extended reporting period upon termination of a claims-made policy is also inapposite. Assuming arguendo that the regulation does apply to the policies—something which Illinois National disputes—it is not helpful to CheckRite because it only applies where the policy is terminated, not to renewals, and the mandatory extended reporting period of either 60 or 90 days is less than the time CheckRite took in

any event. *See* N.Y. Comp.Codes R. & Regs. tit. 11, § 73.3(c) and (d) (1999).

10. The court determined that the parties expected continuous coverage if the policy was renewed in light of a clause excluding "acts or omissions occurring prior to the effective date of the first policy issued ... and continuously renewed thereafter". *Helberg*, 657 N.E.2d at 834.

11. CheckRite is actually somewhat inconsistent in its characterization of the Second Amended Complaint. At another point in its legal memoranda it characterizes the commencement of a class action as a "single notice of a claim as to an entire group".

Those claims, according to CheckRite, would have come into existence (been "made") throughout the duration of the class and into the 1996–97 Policy. The May 1996 filing of the Second Amended Complaint would not be when the claim was made after all. As explained below, this is not a reasonable construction of the policy. Moreover, even assuming arguendo that it were, coverage under the 1996–97 Policy would nonetheless be unavailable due to the "pending or prior litigation" exclusion clause.

In support of its argument that each class member had a distinct "claim" within the meaning of the policy, CheckRite points to the fact in order to be entitled to damages a class member had to file a proof of claim. It also points to the fact that the class certified in August 1996 was in part forward-looking because it included persons who "will be sent during the pendency of this action [FDCPA-violative notices]". With respect to some class members, then, the unlawful conduct may not have occurred as of the May 1996 filing.

.There is no federal or state case applying New York law that has directly addressed the issue of whether a class action filing represents a single "claim" for purposes of a claims-made policy. In those cases involving class actions and claims-made policies the courts have without discussion treated a class action filing as a unitary claim. *See Zunenshine v. Executive Risk Indemnity,· Inc.,* No. 97 Civ. 5525, 1998 WL 483475, at \*4–5 (S.D.N.Y. Aug. 17, 1998) (construing each of two class actions filed against insured as separate claim although concluding later action was barred by pending litigation exclusion); *Spectrum,* 930 F.Supp. at 847 (construing each of several class actions filed against insured to be a separate claim). Thus, these are essentially uncharted waters.[12]

The policy does not contain express terms addressing this question. Consideration of the definitions of a claim and when a claim is made, however, in light of the entire policy, leads to the conclusion that CheckRite's proposed construction is not reasonable.[13] First, under the policy, as

12. The court is aware of only two decisions from any jurisdiction that have addressed directly a question such as the one presented here, albeit in the different procedural posture of a suit by the injured third party against the liability insurer directly. These courts did decide that in the absence of relevant authority they could not conclude that *California* courts would find the filing of a class action to be a "claim" within the meaning of a claims-made insurance policy with respect to the injuries of any prospective, unnamed class member. *See Staudt v. Artifex Ltd.,* 16 F.Supp.2d 1023 (E.D.Wis.1998); *see also Berres v. Artifex, Ltd.,* 21 F.Supp.2d 909 (E.D.Wis.1998) (adopting *Staudt*). Those cases are of marginal relevance at best, however, as they involved predictions as to what would be the rule under California law by the District Court for the Eastern District of Wisconsin. They also both concerned the same insurer and the same class action filing. In addition, it is unclear from the decisions what was the definition of "claim" under the policy. This court does not find these opinions persuasive here.

13. Although this determination is reached through interpretation of the contract provi-

sions rather than by resort to extrinsic evidence, it is worthy of note that the undisputed record evidence shows that CheckRite itself treated the Second Amended Complaint as a single claim. Its February 20, 1997 letter was its sole report to Illinois National regarding the Second Amended Complaint before the expiration of the 1996–97 Policy. In that letter, CheckRite refers to the potential for multiple "claims" by class members but states that it is "tendering a claim [singular]" in relation to the August 1996 certification order. Moreover, according to its own characterization of its subsequent communications, at no time did it treat the class members' claims as divisible for purposes of the policy. For example, it did not forward to Illinois National any individualized information as to those claims, such as copies of the proofs of claim which it now says were what triggered individual claims. The next communication after February 20, 1997, was in June of 1998, at which time CheckRite continued to treat the Second Amended Complaint as a unitary claim. Indeed, if CheckRite were to succeed in its argument that each class member's claim was a separate one under the policy, then its right to coverage would appear to be

well as under the general understanding of the courts, a claim is a demand by a third party against the insured for money damages or other relief owed. The Second Amended Complaint represented a demand by the group of persons who made up the class. It sought money damages for injuries inflicted on those persons based on certain unlawful acts during a specified time period.

Moreover, with respect to the issue of when a claim is made, under the policy this occurs "when a written 'Claim' is first mailed to or filed against the 'Insured'". This occurred when the Second Amended Complaint was filed. At that time, Check-Rite was necessarily made aware that it was confronted with possible liability as to any class member, named or unnamed, current or prospective. That some individuals' right to obtain damages may not have matured at the point of this filing does not change this analysis. Therefore, the filing of the Second Amended Complaint must be deemed to constitute a claim on behalf of the class members as defined by the pleading and subsequent class certification order in August 1996.

■ Finally, even if CheckRite were correct that each class member must be considered to have a distinct "claim made," coverage would not be available under the 1996–97 Policy because of the "prior or pending litigation" exclusion clause. This clause states that the policy does not apply to "[a]ny pending or prior litigation as of the effective date or retroactive date, if any, of the 'Policy Period', or arising out of the same or essentially the same 'Wrongful Acts' alleged in such pending or prior litigation."

Exclusion clauses such as this one are common in "claims made" policies. Generally speaking, where courts have been called upon to resolve interpretive difficulties it has been in relation to whether the factual nexus between a new claim and the facts underlying prior or pending litigation

barred by the fact that it did not report these

is sufficient to say that the claim arises from that litigation. *See Zunenshine*, 1998 WL 483475, at *4; *Spectrum*, 930 F.Supp. at 848. In this case, however, the issue is more simple. Here, litigation of the Second Amended Complaint was *itself* pending as of November 1, 1996. The claims of individual class members were part and parcel of the litigation of the Second Amended Complaint. Thus, they are necessarily excluded under the plain language of the 1996–97 Policy by the clause barring coverage for "any pending or prior litigation as of the effective date ... of the 'Policy Period'". This interpretation is consistent with the rule that exclusion clauses should be construed narrowly and in favor of coverage. Interpreting the provision any other way would stretch the terms of the policy beyond reasonableness.

### E. *No Award of Fees and Disbursements is Merited*

■ The foregoing establishes that Checkrite's complaint presented serious and difficult questions. It is not appropriate under these circumstances to grant Illinois National's motion for fees and disbursements. *See Oliveri v. Thompson*, 803 F.2d 1265, 1271–73 (2d Cir.1986).

### *Conclusion*

For the reasons set forth above, the motion by CheckRite for summary judgment is denied, and the motion by Illinois National for summary judgment is granted insofar as it seeks a declaration that Illinois National had no duty to defend or indemnify CheckRite in connection with the underlying litigation herein, and dismissal of the complaint. Illinois National's motion for attorneys' fees and disbursements in this action is denied.

It is so ordered.

individual claims as such.